**SOUTH FALLS CORPORATION et al., Appellants,**

v.

**Manuel KALKSTEIN et al., Appellees.**

**No. 21080.**

United States Court of Appeals Fifth Circuit.

July 7, 1965.

Rehearing Denied Aug. 24, 1965.

Charles Marcus, Robert Hyer Thomas, William M. Taylor, Jr., Marvin Lewis, Dallas, Tex., for appellants.

John L. Hauer, Irving L. Goldberg, Carl E. Oates, Dallas, Tex., for appellees.

Before TUTTLE, Chief Judge, and BROWN and GEWIN, Circuit Judges.

GEWIN, Circuit Judge.

The primary controversy in this case centers around the validity and enforceability of a rent bond purportedly issued by the appellant United Benefit Fire Insurance Company (hereinafter United Benefit) to guarantee the rent payable under a sublease of commercial property in Wichita Falls, Texas. Also at issue is the question whether the activities of the lessor under the main lease of this property effected a surrender of the leased property by operation of law which would relieve the main lessee of further liability for rent. A rather detailed statement of facts is necessary to an understanding of the issues presented.

There are three principal groups of parties to this litigation. The plaintiffs are general partners in Long Falls Realty Company, a New York limited partnership whose shares have been sold to the investing public. Long Falls derived its interests in the property in question from Lasro Corporation, a New York corporation, which, in turn, derived its interest from its parent, Tenney Corporation, another New York corporation. Tenney, Lasro, and Long Falls are interrelated enterprises engaged in the promotion of real estate ventures, and they will sometimes be referred to collectively as the Long Falls group.

A second group of parties consists of the defendant South Falls Corporation, a Texas corporation, and its sole shareholders and officers, Morris, Peterson, and Cash. Collectively they will be denominated the South Falls group. South Falls later became the sole shareholder in Giant Stores of Wichita Falls, Inc., a Texas company which was organized to operate a discount department store on the property in question, although at the time of the occurrences described below it owned only about twenty-five per cent of Giant's shares. Giant was at that time a Texas affiliate of a discount department store operation in Indiana.

United Benefit, a Nebraska corporation which in 1961 was engaged in the fire insurance and general bonding business, is the third distinct interest represented in this litigation. Its local recording agent in Dallas, Texas, J. C. Hadsell, issued the rent bond which is the focal point of the present controversy.

The record indicates that the South Falls group conceived the idea of constructing discount department stores on two eight-acre tracts of land in Wichita Falls and Longview, Texas. South Falls apparently hoped to sell the two stores to a New York syndicate, take a lease-back, and sublet to its proposed affiliates, Giant Stores of Wichita Falls, Inc., and Giant Stores of Longview, Inc., which would serve as the operating entities. In turn, the Giant stores would lease space to various concessionaries.[1]

In February or March 1961, representatives of South Falls approached Hadsell for the purpose of ascertaining whether one of the companies which he represented would write a bond guaranteeing the payment of rent on a sublease of the premises on which the discount stores were to be located in Wichita Falls.[2] It was thought that such a bond would place credit behind a lease of the premises, thus facilitating interim financing of the construction of the store building. Furthermore, the record is clear that another purpose behind the concept of bonded rent was to facilitate the sale of the store or

---

1. At least one chapter in the financial debacle of the Giant Stores venture has previously had the attention of this court, and many of its major participants reappear here. See South Falls Corp. v. Rochelle, (5 Cir. 1964) 329 F.2d 611.

2. This case involves only the conveyances, leases, and rent bond which relate to the Wichita Falls tract. While identical transactions with respect to the Longview tract were consummated simultaneously with those discussed in this opinion, only the Wichita Falls transactions will be referred to except where necessary.

the acquisition of a permanent loan on the property by providing something which would assure a third party that rent would be forthcoming from Giant under the sublease.

At first Hadsell was dubious, but he mentioned the idea to Earl Cefrey, the Executive Vice-President of United Benefit, when Cefrey was in Dallas. Cefrey became interested and obtained financial and other information about the proposed lessee and subtenants. Prior to May 1, 1961, Cefrey approved the writing of the bond after having discussed the matter with an underwriting committee composed of other United Benefit officials. However, issuance of the rent bond was conditioned on receipt by United Benefit of indemnity agreements from South Falls and its individual shareholders and officers. Such indemnity agreements would insure the bonding company that it would have someone to look to if there were a default and it became obligated to assume the rental payments.

South Falls' negotiations with the original New York syndicate apparently foundered, but in April 1961 another New York group, represented by Tenney Corporation, began considering the possibility of purchasing the Longview and Wichita Falls tracts. The evidence indicates that the Long Falls group was never apprised of any of the negotiations between the South Falls group and Hadsell with reference to the issuance of the rent bonds. In connection with the contemplated purchase of the Wichita Falls tract, Tenney examined a proposed form of the rent bond. Tenney's attorneys deemed the bond unsatisfactory because it gave only South Falls, the sublessor, direct rights to enforce the instrument. Hence, the bond was rewritten by Tenney's attorneys prior to May 1, 1961, in an attempt to give Tenney or its nominee direct rights under the bond.

By a contract dated May 1, 1961, Tenney Corporation agreed to purchase the two tracts from South Falls and South Falls agreed to construct discount department stores on each tract. Closing was to occur before November 1, 1961, after South Falls had given 90-day notice of its expectation to complete the buildings. The agreement provided in part that at the closing South Falls would convey the eight-acre Wichita Falls tract to Tenney Corporation or its nominee. Tenney agreed to execute a lease back to South Falls in accordance with terms stipulated in the contract. South Falls in turn would execute a sublease to Giant Stores of Wichita Falls, Inc. The contract of sale clearly indicates that the sublease to Giant Stores was to be bonded by United Benefit, but there was no reference in this contract to any private indemnity agreements between United Benefit and the South Falls group. South Falls also promised to make a collateral assignment to Tenney or its nominee of the rents due to it from Giant Stores under the sublease. This collateral assignment would secure, through the medium of the rent bond, South Falls' obligations to pay rent to Tenney or its nominee under the main lease.[3] Copies of the proposed bond, the main lease, and the sublease to Giant Stores were attached as exhibits to the contract.

On May 9, 1961, Hadsell executed the rent bond as rewritten, attaching to it a mimeographed power of attorney from the United Benefit home office which authorized him to write bonds up to $750,000. The bond purported to guarantee the payment of rent for ten years under a lease from South Falls to Giant Stores dated "as of May 1, 1961" in the amount of $75,000 annually. After these bonds were signed by Hadsell, they were delivered to Tenney Corporation for examination. Although the bonds do not so indicate on their face, parol evidence in the record shows that Giant Stores, the principal, did not sign the bonds until some time after they were returned from New York to Texas in late October.

---

3. In addition, the individual shareholders, officers, and directors of South Falls were to guarantee South Falls' obligations to Tenney under the main lease.

During the summer of 1961, the South Falls group obtained interim financing of $1,200,000 from Octagon Investment Corporation on the strength of its contract of sale with Tenney. Construction of the building then commenced.

In the late spring and summer of 1961, there was a reorganization and personnel turnover in the bond department at United Benefit's home office in Omaha. A large stockholder had become concerned about the company's lack of financial success in general. There were numerous resignations including that of Cefrey, who had originally approved Hadsell's writing of the bonds. Donald Crocker became the new chief executive officer of the company. In early June the home office revoked the authority of all its recording agents to write bonds by mailing to them a mimeographed letter of revocation dated June 2, 1961. Hadsell received a copy of this letter, which asked that he return all unused powers of attorney to Omaha, but apparently he did not comply with this latter request. There is no evidence that this letter of revocation was ever brought to the attention of anyone connected with the South Falls or Long Falls groups. However, Hadsell was listed as local recording agent for United Benefit pursuant to the terms of Art. 21.14, Texas Insurance Code, Vernon's Annot.Civil Stats.

On June 6 Hadsell forwarded copies of the two rent bonds to Omaha along with a complete execution report, financial statements, and corporate and individual indemnity agreements from the South Falls and Giant Stores groups. There was evidently some confusion in the home office because, in response to a later inquiry from Hadsell, the Omaha office informed Hadsell that they were unable to find any of the papers he had sent in June. On August 9, Richard Thompson of the Omaha office wrote Hadsell in part as follows: "I can only suggest that you have further search and if you are still unable to trace them [the indemnity agreements] then it will be necessary for you to have new documents drawn up." Hadsell obtained new indemnity agreements from South Falls and Giant Stores and their stockholders on August 15 and 23, and forwarded them to Omaha.

On August 16, South Falls issued a check to Hadsell in the amount of $18,600, which constituted the premium and fee agreed upon for the first year for the two rent bonds. The record indicates that Hadsell had represented to South Falls that the premium would be 2% of the face amounts of the bonds, payable annually, plus an initial fee of 10%, payable in the first year. However, the record is clear that Hadsell did not inform the Omaha office that any premium or fee had been paid other than the $3,600, which represented 2% of the face amount of the bonds. This was apparently the usual premium that United Benefit charged for writing a bond. The district court found that South Falls had no knowledge or notice that Hadsell intended to keep the $15,000 initial fee for himself.

In September 1961, Kenneth Holm, an attorney who had been retained by United Benefit to handle its bond claims, began investigating the rent bonds in question. In early October, Hadsell furnished Holm with full information about the bonds and again forwarded execution reports and copies of the bonds to Omaha. On October 17 Holm sought to arrange an interview with Hadsell concerning the rent bonds, but no meeting was held until December 1961, over a month after the delivery of the Wichita Falls bond at the closing of the May 1 contract of sale between Tenney and South Falls on October 28 and 31, 1961. Also, on October 17, Holm sent letters to Hadsell and South Falls in which he stated that the bonds were not assignable without the express consent of United Benefit, but it is not clear whether this information was ever communicated to representatives of the Long Falls group.

Prior to the closing in late October, attorneys for the Long Falls group had noted certain discrepancies between the documents and their understanding of the agreement and these were called to the attention of the South Falls group. The

original sublease from South Falls to Giant Stores included all eight acres of the Wichita Falls tract, contrary to the asserted understanding of the parties.[4] Likewise, the bond which guaranteed the rent under this lease referred to eight acres. At the October 28 meeting, appropriate changes, describing the seven acres which Tenney or its nominee had agreed to lease back to South Falls and which would become the subject of the sublease to Giant Stores, were made on the sublease and the bond. Hadsell, purporting to act for United Benefit, initialed the changes on the bond. At this time it was also noted that the sublease from South Falls to Giant Stores was dated "as of May 1, 1961." Since Giant Stores of Wichita Falls, Inc., was not formally incorporated until June 1, 1961, the date of this lease was changed to June 3, 1961. However, no corresponding change was made on the rent bond, and it still purports to guarantee rents under a lease from South Falls to Giant Stores dated "as of May 1, 1961."

Although all the necessary papers and deeds were executed at the October 28 meeting, final delivery and payment were postponed until settlement of a controversy which had developed over the coinsurance requirements of the contract. In accordance with the contract provisions, Lasro Corporation, a Tenney subsidiary, served as Tenney's nominee at the closing. Hence, pursuant to the contract of sale, South Falls deeded the eight-acre tract to Lasro and Lasro executed the seven-acre leaseback as agreed. South Falls executed a collateral assignment to Lasro of the rents due to it under the sublease to Giant for the purpose of securing its own obligations under the main lease. Lasro in turn conveyed its interest in seven leased acres to Philip Levine, Trustee, subject to the lease agreement between Lasro and South Falls. Levine then deeded the property to Long Falls Realty Company, the plaintiff in the present controvery. By October 31 the issue of coinsurance had been resolved, and final closing was effected on that date by payment of the purchase price and delivery of all the appropriate papers. Although United Benefit had been concerned about the execution of the bonds for some time, no attempt was made to return the premiums which the home office knew had been paid for the bonds in August.

Payments were made as planned under the leases until late 1962, when Giant Stores found itself in straitened financial circumstances. Giant defaulted in its rental obligation to South Falls and South Falls in turn became delinquent in its payments to Long Falls under the master lease. The rent under the main lease for November and December 1962 became overdue, but it was paid by South Falls in January 1963, after written demand. By January 23 Giant had been adjudicated a bankrupt and its trustee had vacated the premises and rejected the sublease. This suit was filed by the Long Falls group on March 8, 1963, to collect past due rents from South Falls on the master lease pertaining to the Wichita Falls property and also to enforce the rent bond against United Benefit. No rent had been paid from January 1963 up through the commencement of the trial in September 1963.

The district court, sitting without a jury, made Findings of Fact and Conclusions of Law after hearing extensive oral testimony and examining a multitude of exhibits. The court held that the main lease was in effect up until the time of the trial and that the rent bond was a valid

4. In this connection, it should perhaps be noted that the copy of the May 1 contract which has been filed as an exhibit on this appeal refers specifically to an agreement that only seven of the eight acres in the Wichita Falls tract would be leased back to South Falls at closing and would thus become the subject of the sublease to Giant Stores. This exhibit purports to be the original copy of the contract, and no alteration as to the acreage appears from the face of the document. Nevertheless, the record contains testimony that the contract as originally executed referred to a lease back of the full eight acres, although it was "no secret" that Tenney or its nominee planned to retain one acre for itself.

and subsisting obligation of United Benefit which the Long Falls partners could enforce as direct beneficiaries. Accordingly, the court entered judgment for the plaintiffs against South Falls and its individual shareholders for past due rentals, ad valorem taxes, interest, and penalties, and against United Benefit for the amount for which it was liable under its rent bond. United Benefit was given a judgment over against South Falls and its shareholders, Peterson, Morris, and Cash, for all amounts which United Benefit might become obligated to pay under the judgment. This latter award was made pursuant to a cross-claim filed by United Benefit on the private indemnity agreements signed by South Falls and its shareholders. Both United Benefit and the South Falls group appeal, except the individual defendant Peterson.

After a careful review of the record and exhibits, we are convinced that the trial court reached the correct conclusion on both of the major issues raised on this appeal. We are of the opinion that all the findings of fact necessary to support the legal conclusions on which we affirm the decision of the district court are amply supported by the testimony and exhibits.

## I.

South Falls, Morris, and Cash urge that certain attempts by attorneys for Long Falls to lease or sell the Wichita Falls property effected a termination of the main lease by operation of law, thus exonerating them from any liability for rent during 1963. It is clear that Giant Stores occupied the Wichita Falls building under the sublease until its adjudication in bankruptcy on December 4, 1962. However, there is evidence in the record that there was no formal abandonment until January 23, 1963, when the trustee

formally rejected the sublease on behalf of the bankrupt estate. South Falls made rental payments on the main lease for the months of November and December 1962, but it is undisputed that no rental payments which might have accrued after January 1, 1963, were made to Long Falls.

In Texas a lease agreement may be terminated only by the mutual consent of lessor and lessee. See, e. g., Stewart v. Basey, 241 S.W.2d 353, 358 (Tex.Civ.App.1951), aff'd 150 Tex. 666, 245 S.W.2d 484; Barret v. Heartfield, 140 S.W.2d 942, 944–45 (Tex.Civ.App. 1940). An agreement to terminate may be inferred from the objective acts of the parties. See, e. g., Cannon v. Freyermuth, 4 S.W.2d 84 (Tex.Civ.App.1928). Hence, there is said to be a surrender by operation of law whenever the parties have so acted that it would be inequitable for either to assert the continued existence of the lease. Therefore, if, upon an abandonment of the premises by the tenant in possession and a default in the rental obligation, the landlord re-enters and relets *for his own benefit*, the tenant's obligations will be considered terminated by operation of law. See, e. g., Flack v. Sarnosa Oil Corp., 293 S.W.2d 688, 689 (Tex.Civ.App.1956); Wheeler v. Thomas, 328 S.W.2d 891, 896 (Tex.Civ. App.1959). The tenant's abandonment constitutes an offer to terminate which is deemed accepted by the landlord's acts inconsistent with the tenant's continued possession.

In the instant case there is evidence that subsequent to the bankruptcy of Giant Stores and the failure of South Falls to pay its rental obligations, an attorney for Long Falls employed two brokers to find a possible purchaser or lessee for the Wichita Falls property.[5]

---

5. Long Falls' attorney testified with respect to the employment of a Wichita Falls broker as follows:
   "A. I did not employ him to sell or lease to them; I employed him, if that be the term, to try to procure such tenant or purchaser for me.

   "Q. Did he submit any tenants to you, either orally or in writing?
   "A. Well, he submitted some tenants to me. I am not quite sure whether they were orally or in writing or whether he ever even actually named them. He said that he had some people that

Apparently these negotiations were brought home to the South Falls group, although there is no substantial evidence that the Long Falls group ever formally notified South Falls that it intended to relet for the latter's account.[6]

South Falls argues that these negotiations were acts clearly inconsistent with the continuance of its tenancy. As further evidence of Long Falls' intent to terminate the lease, South Falls points to the fact that no formal demand was made between the time the January rent fell due and the filing of the suit.[7]

■ However, no Texas case has found a surrender by operation of law where the landlord has merely indicated an intent to consider selling or reletting, even if that intent is explicitly brought to the attention of the tenant. In all of the cases cited by the appellant,[8] there had been an actual occupation of the premises by the landlord or an actual reletting for the landlord's benefit without taking proper precautions to avoid a surrender. In the instant case the lessor, Long Falls, neither reoccupied the premises nor actually relet without notifying South Falls of its intention to invoke its option under the lease. Indeed all Long Falls did was search for a *potential* purchaser or lessee, and there is evidence

that Long Falls had not decided what course of action it would ultimately take.[9] It would be absurd to saddle a landlord with the possible burden of relinquishing his right to collect further rents from his defaulting tenant if he merely investigated the possibility of terminating the lease or reletting the premises. In such circumstances, we think Texas requires an actual reletting before a surrender by operation of law can take place.

■ There is clearly no merit in South Falls' further argument that the acts enumerated above amounted to a constructive eviction, since that doctrine only applies where the landlord's act or omission wrongfully deprives the tenant of beneficial enjoyment of the premises; thus *causing* an abandonment by the tenant. See Lucky v. Fidelity Union Life Ins. Co., 339 S.W.2d 956 (Tex.Civ. App.1960); Hoover v. Wukasch, 274 S. W.2d 458 (Tex.Civ.App.1954).

Therefore, we conclude that the district court correctly held that the lease continued in effect up to the time of the trial. The judgment against the South Falls group on the main lease was proper.

## II.

United Benefit, in addition to urging the above contentions, sets forth six reasons why it should not be held liable on

were interested in the property. I, however, was disinterested in substituting the present obligee in my lease with these people and so did not enter in such arrangements.

"Q. At any time did you give South Falls notice of the employment of Mr. Featherston or the employment of Mr. Mitchell, or any of these negotiations?

"A. I don't believe so.

"Q. Did you employ or attempt to employ any other real estate brokers to lease the premises in Wichita Falls, Texas?

"A. Well, I had many meetings with many people in both New York and Dallas asking them to try to find a potential tenant or purchaser for the properties so that, in the event it was one of substance or substantial substance, I would then terminate my lease with South Falls Corporation and then directly relet the same, or if not, I

would deliver such tenant up to South Falls to relet directly, which was in time the case."

6. The lease granted the lessor an option to re-enter and relet for the lessee's benefit without relinquishing its right to continue to collect rents for the lessee. This provision was operative only after written notice to the lessee of a default in the payment of rent.

7. There is some evidence that Long Falls' attorney made several oral demands to Mr. Cash prior to the filing of this action.

8. Dearborn Stove Co. v. Caples, 149 Tex. 563, 236 S.W.2d 486 (1951); Wheeler v. Thomas, supra; Flack v. Sarnosa Oil Corp., supra; C. R. Miller & Bro. v. Nigro, 230 S.W. 511 (Tex.Civ.App. 1921); Wutke v. Yolton, 71 S.W.2d 549 (Tex.Civ.App.1934).

9. See note 5 supra.

the Wichita Falls rent bond. We discuss each of these arguments separately below.

■ (1) The bonding company first argues that no direct rights inured to the Long Falls partners under the terms of the instrument. Laying aside considerations of the wisdom of issuing such an obligation, this argument seems to ignore the plain language of the bond and the asserted purpose behind its issuance. The bond executed by Hadsell contains the following language:

"In the event Principal is in default in the payment of any monthly installment of minimum rent, as hereinabove referred to, accruing as and for any month of the first ten (10) years of the leasehold term of such lease, Surety will within thirty (30) days after determination of such default, make payment to SOUTH FALLS (or the successor to, the assignee of, or the collateral assignee of SOUTH FALLS) of each monthly rental installment so in default; * * *."

"This bond shall inure to the benefit of, and be enforceable by South Falls and any party or parties who may have succeeded to South Falls' rights, title and estate as the landlord in the lease aforementioned, and any party or parties to whom or for the benefit of whom, South Falls may have executed an instrument or instruments collaterally assigning (to secure any obligation of South Falls) the landlord's estate or rights under the lease aforementioned."

The district court found that Long Falls fell within each of these several descriptions and therefore obtained the right to enforce the bond as a direct beneficiary. We think his conclusion in this respect was sound. Furthermore, the evidence clearly establishes that one of the purposes of obtaining the bond was to convince third parties of the financial soundness of the Giant Stores venture, thus facilitating the sale of the property or the securing of a permanent loan on the strength of the Giant operation. This understanding of the parties comports with the court's construction of the language of the bond, and it is immaterial that Holm and the executives at United Benefit after June 1, 1961, did not realize the breadth of the company's obligations on the instrument.[10] In view of the fact that United Benefit had obtained private indemnity agreements from the named obligee on the bonds and the individual members of the South Falls group, any other construction would make no sense of the transaction.

United Benefit points out that the plaintiffs do not fall within the terms of the bond since they did not succeed to South Falls' estate as landlord in the Giant Stores lease and did not qualify as one for the benefit of whom South Falls had executed an instrument collaterally assigning its rights under the lease to secure one of its own obligations. It is apparently admitted that Lasro Corporation, as direct assignee of South Falls would qualify under the language used, but it is contended that there was no reassignment of this security from Lasro to Levine, or from Levine to Long Falls when the property subject to the lease was conveyed. We disagree. In the collateral assignment of the sublease to Lasro to secure the obligations of South Falls under the main lease, the following language appears:

"This assignment * * * shall inure to the benefit of the Assignee, its successors and assigns (*including any party or parties who may hereafter be and become the owner of the property and premises described in and covered by the Lease Agreement*) * * *."

Furthermore, the deeds to Levine, Trustee, and from Levine to Long Falls each provide that they "shall be effective to convey to the Grantee * * * each, every and all of the Landlord's rights, titles, interests and estates under said [main] lease agreement." Reading these instruments together, we think the se-

---

10. See Burk v. Galveston County, 76 Tex. 267, 13 S.W. 455.

curity afforded by the collateral assignment of South Falls' rights under the sublease to Giant passed to each successive owner of the Wichita Falls tract. Hence, the bond guaranteeing Giant's rent became enforceable by its own terms by each successive owner of the property.

(2) Our disposition of the above question obviates any necessity of discussing in detail United Benefit's alternative argument that the bonds were not assignable. The bonds as such simply were never assigned. Since the Long Falls group derives its interests from the face of the bond, it becomes immaterial whether Holm's statement of October 17 constituted a direction that the bonds were not to be assigned. Certainly such a directive would be ineffective to diminish any rights that Long Falls might derive directly from the provisions of the bonds.

(3) In a similar vein, it is asserted that United Benefit's obligations on the bond were somehow merged into its rights under the private indemnity agreements executed by the South Falls group so that its obligation no longer legally exists. This argument is likewise without merit, for it, too, overlooks the independent rights that inure to Long Falls under the very terms of the bond. There is no indication of these private indemnity agreements on the face of the bond, and there is no evidence that any member of the Long Falls group had any actual notice that such agreements had been executed. Nor is there merit in the argument that the "astounding" nature of the obligation put the Long Falls group on notice of any private indemnity agreements or made it clear that United Benefit intended to deny liability on the bond.

(4) United Benefit challenges the trial court's refusal to find collusion and fraud on the part of its agent Hadsell and the South Falls and Long Falls groups in obtaining the issuance of the bond. In particular, as evidence of fraud and collusion, United Benefit points to what it calls the "$15,000 pay-off" which was made to Hadsell for writing the bond.

While it is not controverted that Hadsell did not inform the home office of the $15,000 fee which South Falls paid to him, the district court found that South Falls had no knowledge that Hadsell intended to keep the money for himself. That finding is amply supported by testimony which indicates that no member of the Long Falls or South Falls groups was aware of Hadsell's designs. In addition, there is evidence that such a fee was not considered out of line in light of the unusual nature of the security which the bond undertook to provide. In the absence of collusion between the agent and the party who is attempting to enforce the contract, as between the principal and such other party, the principal must bear the loss if there was a detrimental reliance by the other party on the liability of the principal. In the instant case, the court found that "delivery by South Falls of the said Bond for Payment of Rent was a material inducement to Plaintiffs' predecessors in interest [Lasro] to close the May 1, 1961 sale contract on October 28 and 31, 1961" and that they relied upon the validity of the bond in consummating the transaction.

(5) United Benefit advances the contention that it is not liable to Long Falls because the bond does not refer to any existing lease agreement. While it is uncontroverted that there is no lease between South Falls and Giant dated "as of May 1, 1961," it is clear from the record that the only lease which has ever existed between those parties is dated June 3, 1961. It is also manifest that all parties to the transaction understood that the bond was intended to indemnify the lease of June 3. Furthermore, a credible explanation of the discrepancy in the dates was advanced at the trial. In these circumstances, we are of the opinion that the trial court was correct in concluding that the provision constituted a mutual mistake in drafting the indemnity contract which created a latent ambiguity in its terms. Without

doubt, parol evidence is admissible in Texas to clarify a latent ambiguity.[11]

(6) Since Hadsell reduced the acreage covered by the sublease which the bond indemnified without the prior knowledge or approval of the home office and subsequent to the time the home office had revoked Hadsell's authority to write bonds, United Benefit urges most strenuously that the alteration materially affected the risk it assumed on the bond and thus should exonerate it from liability. Assuming the significance of the alterations from the bonding company's point of view,[12] we hold that the revocation was ineffective as against parties without knowledge of the agent's lack of authority and that Hadsell had actual authority under Texas law to deliver the bond and to act on behalf of the company in altering its terms on October 28, 1961, prior to its delivery.

■ The evidence establishes that Hadsell was appointed local recording agent for United Benefit on February 7, 1958, under Art. 21.14, Texas Insurance Code, Vernon's Annot.Civil Stats. Up to the time of trial there had not been a written revocation of Hadsell's authority in accordance with the terms of this statute. The Texas courts have construed this provision and its predecessor as vesting the local recording agent with authority as extensive as that which the company possesses under its charter. See Aetna Ins. Co. v. Paddock (5 Cir. 1962) 301 F.2d 807, 809; Shaller v. Commercial Standard Ins. Co., 158 Tex. 143, 309 S.W. 2d 59, 63–64 (Tex.1958); Home Ins. Co. of New York v. Roberts, 129 Tex. 178, 100 S.W.2d 91 (1937) (construing the predecessor of Art. 21.14).[13] Therefore, any uncommunicated revocation of Hadsell's authority to write bonds was ineffective as against Long Falls. Since United Benefit had authority to alter the terms of the bond at least until its contractual obligations under the bond became effective through delivery, Hadsell's changes prior .to delivery were binding on the company.

In addition, we think that in light of the trial court's finding that Long Falls relied on the effective delivery of the bond as a material factor in its consummation of the May 1 contract, the trial court would have been justified in concluding that Hadsell had apparent authority to act for the bonding company. Certainly he purported to act for United Benefit at the closing, and there is no allegation that either South Falls or Long Falls acted improperly in relying on his authority. Indeed, there is testimony that at closing one of the Tenney attorneys asked Hadsell to produce evidence of his power to act for United Benefit, and Hadsell exhibited a power of attorney which authorized him to write bonds up to a maximum of $750,000.

Finally, it is perhaps well to note that from our own independent examination of the record we perceive a singular lack of diligence on the part of United Benefit's

---

11. See, e. g., Punch v. Gerlach (Tex.Civ. App.1954) 267 S.W.2d 182; Jasper State Bank v. Goodrich (Tex.Civ.App.1937) 107 S.W.2d 600.

12. It is argued that Lasro retained for itself the most valuable acre of the Wichita Falls tract, constituting frontage on a major highway. This reduced the value of the property on which the bonded rent was to be paid without any corresponding reduction in the rental obligations. The bonding company's rights would be adversely affected, the argument goes, since it would be subrogated to the tenant's rights in a less valuable piece of property in the event of default.

13. In Shaller, the Supreme Court of Texas stated:

"* * * The purpose of the statute was to vest local recording agents with authority co-extensive with that of the company insofar as writing insurance is concerned and to remove all questions of the local agent's actual or apparent authority from the field of cavil or dispute. It follows that subsequent instructions given by the company to recording agents although taking the form of apparent restrictions upon the agent's authority can be classified only as directive to the agent rather than exceptions or modifications of the agent's authority which is essentially statutory in nature."

Omaha office in investigating the nature of the obligation which it assumed to undertake in the rent bond, in determining the facts surrounding the issuance of the bond, and in attempting to rectify the situation by tendering a return of the premium. No doubt this situation was largely the result of the reorganization of United Benefit's bond department. We realize that the district court made no finding that the bonding company dealt with the bond in a negligent fashion, and we do not intend these comments as such a finding. We merely point to this situation as additional support for our conclusion that the obligation is binding on United Benefit.

For all the foregoing reasons, we think the judgment of the district court was right. It is affirmed.

Moore, Circuit Judge, dissented in part.