Plaintiff, Cincinnati Insurance Company, began this litigation by filing suit in the United States District Court for the Northern District of Alabama seeking to have surety bonds issued in its name declared invalid and unenforceable. Judgment was entered against plaintiff, and plaintiff appealed to the United States Court of Appeals for the Fifth Circuit.
The Court of Appeals encountered uncertainty in the Alabama law applicable to the case and certified to this Court certain questions of law pursuant to Article 6, § 140 (b)(3), Constitution of Alabama of 1901, as amended in 1973, viz.:
 "1. Are the surety bonds void because of failure to comply with the statute of frauds, Tit. 20, § 3, Code of Ala.?
 "2. If the surety bonds are not void, are they enforceable against CIC?
 "3. If the bonds are valid and enforceable is Talladega entitled to an award of attorney fees with respect to either or both bonds?"
We answer these questions thusly:
1. No.
2. Yes.
3. Yes and No.
The following is the statement of the case given by the Court of Appeals:
 In January 1968 the Cincinnati Insurance Company [CIC], an Ohio corporation, appointed John R. Lucas to be an agent for it in Alabama. As required by statute (Code of Ala., Title 28, §§ 66, 85 (20)-(38), and 86), Lucas obtained a license from the state Superintendent of Insurance authorizing him to act as agent for CIC in Alabama. This license was issued pursuant to applications submitted by both Lucas and CIC's vice-president. It authorized Lucas to represent CIC in the writing of several classes of insurance, including fidelity and surety. The applications and license set forth no limitations on the powers of Lucas to represent CIC in the writing of insurance in the named classes.
 For the purposes of the writing of fidelity and surety bonds, Lucas received from CIC a "bond kit" which consisted of a number of gummed gold corporate seals of CIC and a supply of undated power of attorney forms presigned by CIC's vice-president. These power of attorney forms stated that Lucas was appointed CIC's attorney-in-fact to execute for CIC "any and all bonds, policies, undertakings, or other like instruments . . . up to $150,000.00".
 CIC and Lucas also executed a written agency agreement, dated January 25, 1968, which recited that "the company [CIC] hereby grants authority to Agent [Lucas] to receive and accept proposals for such contracts of insurance covering risks of property and casualty insurance located in the State of Alabama as the Company has authority lawfully to make, subject, however, to restrictions placed upon such Agent by the laws of the state or states in which such Agent is authorized to write insurance business," and that the "Agent has full power and authority to receive and accept proposals for insurance covering such classes of risks as the Company may, from time to time, authorize to be issued." The terms and provisions of the Agency Agreement were not shown to have been made known to defendants.
 In October 1966 the City of Talladega engaged Philip Kessler to perform architectural services in connection with proposed *Page 333 
construction of a public building, and to perform for the work "customary, ample and sufficient services pursuant to the construction thereof, including supervision and contract control."
 The Talladega City Commission received bids for the project and Edwin W. Hare, doing business as Hare Construction Company, was the low bidder with a bid of $487,709. To meet the requirements of Title 50, § 16, Hare was required to supply a performance bond in the amount of $487,709, and a labor and material bond in the amount of $243,854.50. Hare contacted Lucas for the writing of the bonds, and in turn Lucas contacted CIC requesting authority to execute the bonds in CIC's behalf as surety. CIC explicitly refused to grant Lucas this authority, but no officers or employees of the City of Talladega had knowledge of such refusal.
 On April 16, 1968, Kessler delivered to the City Commission the contract documents for construction of the building by Hare. Included were the performance bond and payment bond, each dated April 2, 1968, and each executed on behalf of CIC with the signature of Lucas.** Each bore a gold certificate seal of CIC. Attached to each was a photo-copied power of attorney certificate purporting to authorize Lucas to enter into surety bond obligations on behalf of CIC up to a maximum amount of $750,000. The power of attorney forms were dated and initialed by Lucas.
 CIC at no time issued power of attorney forms to Lucas which authorized him to enter into surety bonds for an amount greater than $150,000. The officers and employees of the City of Talladega had no knowledge or notice of this limitation.
 The parties are in dispute as to whether the City of Talladega, by and through its officers and employees, or Kessler, its Architect, had any knowledge as to whether or not Lucas was an agent of CIC, duly licensed as such by the State of Alabama, and had any knowledge as to whether Lucas had executed the Agency Agreement with CIC dated January 25, 1968, aforementioned. Kessler did ascertain CIC was licensed to do business in Alabama but made no inquiry as to whom its agents were.
 After receiving an invoice from Lucas Insurance Agency for the performance and payment bonds, Hare delivered to that agency a premium payment in the form of a check dated April 19, 1968, in the amount of $9,754.18, which was deposited by Lucas in the bank account of the Lucas Insurance Agency. The invoice was signed by Lucas and marked paid on "4/23/68". These funds received by Lucas were never forwarded to CIC or returned to Hare or the City of Talladega.
 On April 16, 1968, the City Commission accepted the bonds and work commenced on the building April 26, 1968.
 On June 18, 1968, the state representative of CIC discovered that bonds naming CIC as surety were being used in the Talladega project. At that time, approximately 10% of the construction had been completed. On June 26, 1968, CIC filed a declaratory judgment action in federal district court seeking to have the bonds declared invalid and unenforceable.
 In April 1969 Hare defaulted in performance of the construction contract. The city arranged for construction to be completed by other means at an expense of $103,995.56 in excess of the monies left for performance of Hare's contract when default occurred.
 On September 15, 1969, the complaint was amended to add as parties defendant all unpaid materialmen and subcontractors of the prime contractor, Hare. In addition to counterclaims against CIC, each of the materialmen and subcontractors filed crossclaims against Talladega for recovery from the city, in the event the bonds were declared invalid and unenforceable, for failure to obtain a bond *Page 334 
for the protection of materialmen as required by Title 50, § 16, Code of Ala. When CIC declined to defend these crossclaims under the payment bond, Talladega was required to assume their defense. Talladega's motions to dismiss the crossclaims were overruled in April 1970, and answers were filed by Talladega. The crossclaims then lay dormant pending trial of the preliminary issue of whether the bonds were valid and enforceable.
 At trial in May, 1971, the District Court submitted to a jury special verdicts pursuant to Rule 49 (a) of the Federal Rules of Civil Procedure. Using the special verdicts of the jury, the District Court entered interlocutory findings of fact and conclusions of law.
 The District Court found the surety bonds valid and enforceable against CIC. To the sum of $103,995.56 the Court added $24,243.41 as interest due Talladega on its claim. In addition thereto, the Court found laborers and materialmen to be due the sum of $59,093.97 on their unpaid bills, plus interest and attorneys fees thereon totalling $34,798.56. The Court has also awarded $40,000.00 in attorneys fees to Talladega for its costs of litigation.
1. "Are the surety bonds void because of failure to complywith the statute of frauds, Tit. 20, § 3, Code of Ala.?"
The pertinent part of Tit. 20, § 3, provides:
 "In the following cases, every agreement is void, unless such agreement, or some note or memorandum thereof, expressing the consideration, is in writing, and subscribed by the party to be charged therewith, or some other person by him thereunto lawfully authorized in writing:"
* * * * * *
 "Every special promise to answer for the debt, default, or miscarriage of another."
* * * * * *
[Emphasis supplied.]
The statute of frauds has been held applicable to contractors' bonds. American Casualty Co. of Reading, Pa., v.Devine, 275 Ala. 628, 157 So.2d 661 (1963). Here, the problem is whether the requirement of the statute of frauds that such agreements be ". . . subscribed by the party to be charged therewith, or some other person by him thereunto lawfullyauthorized in writing . . ." has been complied with. [Emphasis supplied.]
Our answer to the first question is "no" — the bonds are not void for failure to comply with the statute of frauds. The license application, which is described in the Court of Appeals' statement of the case, is a writing subscribed by CIC, the party to be charged, evidencing Lucas' authority to write fidelity and surety insurance on its behalf.
We reach no conclusion regarding the sufficiency of the agency agreement to satisfy the statute of frauds. That question is mooted by our conclusion concerning the license application. Although we note that the agency agreement seems to be limited by its opening clause to authorizing Lucas to write "property and casualty insurance," a later clause appears to grant broader authority. Whether the latter clause should be construed as being subject to the limitations of the opening clause, we need not decide.
The facts in this case are somewhat similar to those in Parisv. Johnson, 155 Ala. 403, 46 So. 642 (1908). In Paris, an agent had been authorized in letters from the lessor to lease certain business property in the City of Birmingham subject to the requirement that security for the rents be given by the lessee. The agent executed a lease for a term of four years, but did not take security for the rents at the time the lease was executed. In a suit for breach of the lease, the lessor defended his actions on the ground that the agent had exceeded the written authority given him and the lease was thus void under the statute of frauds. This Court held that the written authority to lease the property satisfied the statute of frauds and noted that the agent's failure to *Page 335 
abide by the written limitation on his authority did not involve the statute of frauds.
We would reach the same conclusion in this case. Lucas' alleged violation of the alleged limitation on his authority does not involve the statute of frauds. He had written authorization to issue surety bonds on CIC by the express terms of the license application.
Under the statute of frauds, whether the obligee on the bonds had knowledge of the writing which authorized the agent to bind the obligor is immaterial. See White v. Breen, 106 Ala. 159,172, 19 So. 59 (1894); Jenkins v. Harrison, 66 Ala. 345, 359
(1880). The statute of frauds requires only that the authorization be in writing.
Furthermore, it is not required by the statute of frauds that the written authorization specify that a particular act is authorized. Regarding the form of an agent's written authorization to enter into contracts falling within the statute of frauds, this Court has said,
 ". . . No form or method of execution of the power of attorney is prescribed. It may be in any form clearly showing the agent's authority, and be executed according to any recognized common law method of executing written instruments. The power may be general, to sell any lands of the principal, to any purchaser, upon any terms; or it may be partly general and partly special or limited, as to sell particular land, to any purchaser, on any terms, or particular land to any purchaser on particular terms; or it may be entirely special, as to sell particular land, to a particular purchaser, on particular terms. In either case, the agent, keeping within the scope of his authority, may make the contract and execute the necessary written evidence binding his principal to its performance."
White v. Breen, 106 Ala. at 169, 19 So. at 61.
The power of the agent in White was derived from a series of letters between the principal and the agent, not from a formally executed document. The license application in the instant case satisfies the requirements concerning execution and form.
2. "If the surety bonds are not void [for failure to complywith the statute of frauds], are they enforceable against CIC?"
We consider this to be the pivotal question in this case: Did Lucas' have actual or apparent authority to issue the bonds and thereby to obligate CIC?
Our answer is "yes" — that Lucas as a licensed agent had actual authority to issue the bonds and to obligate CIC. Lucas was licensed as an agent of CIC pursuant to Tit. 28, §§ 85 (20)-85 (38), Code of Alabama of 1940 (Recomplied 1958).[1]
An examination of Tit. 28, §§ 85 (20)-85 (38) indicates to us that it was the intention of the legislature to provide that the issuance of a license to act as an agent for an insurance company is to be predicated upon the actual authority granted the agent by the company and consequently that the agent actually possess the authority indicated on the license.
Section 85 (21) distinguishes between insurance agents, solicitors, brokers, managing agents, and service representatives. An insurance agent is defined to be
 ". . . a natural person who acts as, holds himself as, or claims to act as a representative of any insurer to accept risks, countersign and issue policies of insurance." § 85 (21)(a).
In subsection (b), an insurance solicitor is distinguished from an insurance agent by the former's lack of ". . . authority to accept risks, countersign and issue policies of insurance. . . ."
Section 85 (24)(d) provides:
 "No applicant for license as an insurance agent shall be examined therefor until an insurer intending to appoint the applicant as such agent shall first deliver *Page 336 
to the superintendent, on forms which shall be furnished, to such insurer by the superintendent on request, a statement of such insurer showing such information as may reasonably be required by the superintendent, including, but not limited to: The class or classes of insurance it intends to authorize the applicant to write or solicit; the investigation it has made of applicant's qualification, character and fitness for the duties to be assumed, and the results of such investigation." [Emphasis supplied.]
Issuance of a license is by the terms of this subsection predicated upon the authority which the agent will be granted by the insurer.
In § 85 (22)(e1), the legislature spoke to the problem of an insurance agent whose agency with a particular company has been terminated but who continues to service customers who had purchased policies with that company through his agency. That section provides that such an agent may continue, under certain circumstances, to countersign all certificates or endorsements necessary to continue the coverage of those policies. However, it is required that he obtain a "limited license" which clearly shows its limited nature. Before a limited license can be obtained, such agents must
 ". . . forthwith surrender their licenses to act for the insurers as to which their authority has been terminated. . . ."
Thus, because "insurance agent" is defined in terms of the authority possessed, because issuance of a license is predicated upon the insurer's grant of authority, because the legislature provided for a limited license in the one case in which it permitted the agent to have limited authority only, and because it is required that the license be surrendered when the authority is terminated, we must conclude that the legislature intended that the issuance of a license indicate that the agent has unlimited actual authority from the insurer to represent it in the forms of insurance business for which the agent is licensed. Thus, an agent licensed pursuant to this statute is a general agent as to those types of insurance which he is authorized to issue.
Our interpretation of Tit. 28, §§ 85 (20)-85 (38), is supported by the interpretation given by the Supreme Court of Texas to a similar provision in the Texas' insurance code.Shaller v. Commercial Standard Insurance Co., 158 Tex. 143,309 S.W.2d 59 (1958). Cf. New York Fire Insurance Co. v. Reed,138 S.W.2d 138 (Tex.Civ.App. 1940).
In Blakely v. American Employers' Insurance Co.,424 F.2d 728, 732 (5th Cir. 1970), Judge Morgan quoted the pertinent provision of the Texas insurance code:
 "`Sec. 2. Definitions; Certain Orders, Societies or Associations Not Affected. — By the term "Local Recording Agent" is meant a person * * * engaged in soliciting and writing insurance, being authorized by an insurance company * * to solicit business and to write, sign, execute, and deliver policies of insurance, and to bind companies on insurance risks, and who maintain an office and a record of such business and the transactions which are involved, who collect premiums on such business and otherwise perform the customary duties of a local recording agent representing an insurance carrier in its relation with the public; * * *' [Texas Insurance Code, Vernon's Annot. Civil Stats., Art. 21.14]."
Regarding the application of this statute to the facts inShaller, supra, the Supreme Court of Texas stated:
 ". . . It is undisputed that Howard Williams was licensed by the State of Texas and duly appointed by respondent as its local recording agent. As such, his authority and the extent thereof was controlled by the provisions of the insurance code and his designation as the type of agent prescribed therein. The purpose of the statute was to vest local recording agents with authority co-extensive with that of the company insofar as writing insurance is concerned and to remove all questions of the local agent's actual or apparent authority from the field of cavil or dispute. It follows that subsequent instructions given by the company to recording *Page 337 
agents although taking the form of apparent restrictions upon the agent's authority can be classified only as directives to the agent rather than exceptions or modifications of the agent's authority which is essentially statutory in nature."
309 S.W.2d at 63. See also South Falls Corp. v. Kalkstein,349 F.2d 378 (5th Cir. 1965), in which the same reasoning was applied with regard to the agent of a bonding company.
In enacting this and similar-legislation (providing for the licensing of insurance agents), the legislature has recognized that the responsibility for an insurance agent's transgression of those limitations placed upon him by his principal (but not known to others) should be borne by the principal, which, after all, has certified to the Superintendent of Insurance that the agent has been investigated and found to be of good moral character and business standing and is thus responsible for the agent's appointment to a position of trust. Clearly, the legislature did not intend that the burden fall upon members of the public who have no effective means of ascertaining the existence of unknown limitations on the authority of dishonest agents.
CIC argues that a holding that it is liable on the bonds would have a devastating effect on the bonding business in Alabama. A similar contention was rejected by this Court inBritish General Insurance Co., Ltd. v. Simpson Sales Co., Inc.,265 Ala. 683, 93 So.2d 763 (1957), in which this Court stated:
 "Appellant says that to approve the rule as here laid down `would lead to most astounding results'; that an agent might even insure property located in China or Ceylon and the company would have no effective control over him. We are not impressed by these arguments. In the first place it is too well-settled to require more than a passing nod that if an agent fails to perform his agreement, whether by exceeding, violating, or neglecting his instructions, he will ordinarily be liable to the principal for the loss sustained thereby, unless the violation has been waived or the wrongful act ratified. . . . The company has the power to determine the conditions of the agency. It may protect itself as it sees fit by requiring surety bond. It may terminate its contract at the first sign of infidelity. It has within its power the determination of what persons shall represent it. In short, it has all the advantages of selection and must bear the burdens thereof if it has failed to choose one faithful to the agency agreement. On the other hand, we have the public, dealing with the agent of the company. In the public view, the agent is the company. . . ." [Emphasis supplied.]
265 Ala. at 688, 93 So.2d at 767.
The policy behind this statute and our interpretation of it is consistent with what this Court has previously held regarding the effect of a licensing statute. In Sun InsuranceOffice of London v. Mitchell, 186 Ala. 420, 65 So. 143 (1914), this Court held that a certificate of the secretary of state showing that Myers was a duly appointed agent of Sun Insuranceprima facie established the general agency of Myers for Sun Insurance. This Court went on to say that, although the company could limit the agent's general authority and the limitation would be binding between principal and agent and upon all third persons with notice of the limitation, it would not be binding upon third persons who dealt with the agent without notice of it. In the present case, there is no evidence whatsoever that Talladega had notice of the limitation which CIC attempted to place upon Lucas' authority.
CIC argues that Sun has no application to this case because the question there concerned the authority of an agent to issue fire insurance, not surety bonds. A similar argument was made in Parsons v. Federal Realty Corp., 105 Fla. 105, 143 So. 912, 88 A.L.R. 275 (1931). There, the Florida Supreme Court held that the maxim that "sureties are favored in the law" has no application to sureties for hire. Further, the court found that there was no sound reason for not treating a surety company the same as *Page 338 
an insurance company with regard to the authority of agents. We agree.
Moreover, Parsons cited Sun for a proposition identical with our holding in the case at bar:
 "And where a state license has been applied for by a surety company, naming a particular person as its agent, with no restrictions on the agency stated in the application, a power of attorney restricting the authority of agent is ineffectual against one dealing with the agent without notice or knowledge of the restrictions."
143 So. at 916.
Finally, we think it relevant to note, in passing, that CIC's actual liability under each bond is, in all probability, less than $150,000, the amount of Lucas' admitted authority. On the labor and materials bond, CIC's liability, including attorneys' fees, was found to be $93,892.53. On the performance bond, its liability, excluding attorneys' fees, was found to be $128,238.97. The attorneys' fees awarded were $40,000.00 and caused the liability to exceed $150,000. That award of attorneys' fees may, however, be reduced as a result of our answer to the third question. Here, CIC is attempting to avoid liability even for the amount of bonds which it admits Lucashad written authorization to write.
3. "If the bonds are valid and enforceable is Talladegaentitled to an award of attorney fees with respect to either orboth bonds?"
CIC concedes that Tit. 50, § 16, Code of Alabama of 1940 (Recompiled 1958), mandates awarding attorneys' fees to claimants under a labor and materials bond. Consequently, the only question presented is whether Talladega, as the obligee on a performance bond executed pursuant to Tit. 50, § 16, is likewise entitled to an award of attorneys' fees incurred in enforcing the bond.
The general rule is that, in the absence of statute, contract, or recognized equitable grounds, there is no right to recover attorneys' fees from an opposing party, either as costs or as damages. Hartford Accident Indemnity Co. v. Cosby,277 Ala. 596, 173 So.2d 585 (1965); Mason v. City of Albertville,276 Ala. 68, 158 So.2d 924 (1963); Inland Mutual Insurance Co.v. Hightower, 274 Ala. 52, 145 So.2d 422 (1962).
Talladega argues that the provisions in Tit. 50, § 16, regarding attorneys' fees are ambiguous and may be interpreted to require awarding of attorneys' fees to the obligee on a performance bond. Our reading of Tit. 50, § 16, does not disclose an ambiguity. From the following portion of § 16, it seems clear to us that the provision for attorneys' fees applies only to labor and materials bonds:
 "Any person, firm or corporation entering into a contract with the state or any county or municipal corporation or subdivision thereof in this state for the repair, construction or prosecution of any public buildings or public work, highways or bridges, shall be required, before commencing such work, to execute a performance bond, with penalty equal to fifty percent of the amount of the contract price, and in addition thereto, another bond with good and sufficient surety, payable to the state, county or municipal corporation or subdivision, letting the contract, in an amount not less than fifty percent of the contract price, with the obligation that such contractor or contractors shall promptly make payments to all persons supplying him or them with labor, materials, feed-stuffs or supplies for or in the prosecution of the work provided for in such contract, and for the payment of reasonable attorneys' fees, incurred by successful claimants or plaintiffs in suits on said bond; and any person, firm or corporation that has furnished labor, materials, feed-stuffs or supplies for or in the prosecution or repair of any public building or public work, highways or bridges, and payment for which has not been made, shall be authorized to institute an action upon said bond in his or their name or names and to have their rights and claims *Page 339 
adjudicated in such action and judgment rendered thereon; . . ."
The remainder of the paragraph quoted above sets forth the procedural requirements for bringing suit on a labor and materials bond. The provision for attorneys' fees is preceded by and succeeded by language which pertains solely to labor and materials bonds. There is nothing to indicate that the legislature intended that the provision should pertain to anything but labor and materials bonds.
Talladega further contends that the following paragraph of the labor and materials bond entitles it to recover attorneys' fees incurred in enforcing both bonds:
 "The above named Principal and Surety hereby jointly and severally agree with the Owner that every claimant as herein defined, who has not been paid in full before the expiration of a period of ninety (90) days after the date on which the last of such claimant's work or labor was done or performed, or materials were furnished by such claimant, may sue on this bond for the use of such claimant, prosecute the suit to final judgment for such sum or sums as may be justly due claimant, and have execution thereon. The Owner shall not be liable for the payment of any costs or expenses of any such suit." [Emphasis supplied.]
The indemnification provision of this paragraph applies only to the type of suits which are the subject of the paragraph, namely, suits by claimants on the labor and materials bond. It does not obligate CIC to indemnify Talladega for the costs it may incur in a suit against CIC to enforce either bond. The provision does, however, obligate CIC to indemnify Talladega for its costs in defending suits brought against it by claimants on the labor and materials bond.
Finally, Talladega contends that CIC's breach of its promise in the performance bond to remedy the contractor's defaultpromptly necessitated Talladega's employment of counsel to enforce the bond and thus entitles Talladega to recover attorneys' fees as damages resulting from this breach of the bond contract. This argument is not based on any of the well-recognized grounds for recovery of attorneys' fees stated above. Carried to its logical conclusion, this argument would justify recovery of attorneys' fees whenever one party to a contract breached it, necessitating the other party's bringing suit. This is not the law of Alabama.
Our answer to the Court of Appeals' third question is, therefore, that Talladega is not entitled to recover for attorneys' fees incurred in enforcing the performance bond against CIC, but is entitled to recover all costs and expenses, including attorneys' fees incurred in defending suits brought against it by claimants under the labor and materials bond.
QUESTIONS ANSWERED.
MADDOX, FAULKNER, JONES, ALMON, EMBRY and BEATTY, JJ., concur.
** A jury found, on special verdicts under Rule 49 (a) of the Federal Rules of Civil Procedure, that Lucas signed the performance bond and the payment bond.
[1] These sections, although applicable in the case at bar, were repealed by Acts 1971, No. 407, p. 1067, § 813, effective January 1, 1972, and were replaced by Tit. 28A, §§ 113-154, the provisions of which with regard to the subject at hand are fundamentally the same.