SOUTH FALLS CORPORATION,
Appellant,

v.

William J. ROCHELLE, Jr., Trustee in
Bankruptcy for Giant Stores of Long-
view, Inc., Bankrupt, et al., Appellees.

No. 20785.

United States Court of Appeals
Fifth Circuit.

March 19, 1964.

612

Charles Marcus, Robert N. Benson, Dallas, Tex., for appellant; Mary Neal Sisk, Dallas, Tex., on the brief.

William Madden Hill, Ungerman, Hill, Ungerman & Angrist, Dallas, Tex., for appellee, William J. Rochelle, trustee in bankruptcy of estate of Giant Stores of Longview, Inc.

Philip I. Palmer, Jr., Palmer & Palmer, Dallas, Tex., for appellee, James W. Dugger.

Before BROWN, MOORE * and GEWIN, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

The sole significant legal question in this case [1] is whether the Referee in a summary proceeding correctly required the turnover of money received from the bankrupt estate by the Transferee-Respondents after bankruptcy. We, as did the District Court, affirm this action. Likewise, we, as did the District Court, hold that the inability to identify the precise dollars thus received is no obstacle to a turnover order direct-

---

* Of the Second Circuit, sitting by designation.

1. This case, Bankruptcy 5071, Dallas Division, involved transfers of money from the Longview store. Bankruptcy 1059, Wichita Falls Division, which was heard simultaneously, involved such transfers from the Wichita Falls store. Although the briefs cover specifically the Order in 5071, this appeal will dispose of both proceedings.

ed to Transferees whose remaining assets are sufficient in amount to permit reimbursment. Our discussion of the factual setup is greatly simplified because no attack is here made on the Referee's findings of fact. We are bound by them, and they portray a picture of discriminate application of funds to the advantage of insiders.

The involuntary petitions in bankruptcy were filed on October 31, 1962.[2] The Bankrupts are two corporations, Giant Longview and Giant Wichita Falls,[3] who operated as a discount store in these Texas cities. The Transferee-Respondent is South Falls Corporation, a closely-held corporation whose owners and moving figures were Cash, Peterson and Morris. South Falls—primarily engaged in the business of buying and selling real estate, promoting shopping centers, and the like—while nominally the builder, owner and lessor of the store premises, had heavy financial interests in the two Giants which gave it a status transcending that of a mere landlord. The promoters of the stores were the two Zimmermans who were to manage and operate the stores. Their contribution was to be management with South Falls putting up nearly all of the money. South Falls had a 25% stock interest for which it paid $50,000 plus a debenture loan of $100,000 for each store. Besides its interest as a landlord, South Falls therefore had an immediate investment of $300,000 riding on the success of the enterprise. The stores opened in Sep-

tember 1961. The Zimmermans, as contemplated in the arrangement, took over the complete management and operation, most of which was conducted from Indiana. Though Peterson and Cash were Directors, they made no effort to influence the Zimmerman management. Things did not go well, and by May 1962 each store had incurred losses in excess of $100,000. The situation continued to deteriorate. Creditors of one kind and another were clamoring for payment. Of the creditors, some of the most persistent and, so far as this record is concerned, most successful, were companies operating leased departments. Two of them figure heavily in later incidents. Lesal, a Texas subsidiary of Morse Shoes, operated a shoe department as did Di-Deb in another line for Marrud. Though the record does not contain the leases and only vague information was given about them through interested witnesses whom the Referee discredited, it is South Falls' contention that under the arrangement, the Giant Store was to remit periodically the gross sales of such leased departments received through Giant cash registers. As to many, this was not done. By August this indebtedness was both past due and large, and on August 20 promissory notes were issued by the respective Giants to these department lessees.[4] By September 12 things were hopeless, hopeless that is for the South Falls interest. On that date—following what must have been intense conferences, negotia-

2. The order adjudicating bankruptcy was not entered until December 5, 1962. A petition for an arrangement under Chapter XI was filed in each proceeding on November 20, 1962. Within two weeks' time it became apparent that there was no reasonable hope of offering a feasible plan

of reorganization, and each of the Bankrupts consented to adjudication of bankruptcy on December 4, 1962.

3. Giant Stores of Longview, Inc.; Giant Stores of Wichita Falls, Inc.

4.

| Lessee | Face Amount of Notes | |
| --- | --- | --- |
| | Giant Longview | Giant Wichita Falls |
| Di-Deb | $31,925.08 | $41,773.91 |
| Lesal Retailers | 37,276.00 | 40,878.08 |
| Total | $69,201.08 | $82,651.99 |

tions, and intense bargaining among the entrepreneurs in their reflex to nature's first law of preservation of self-interest —a sweeping and decisive "settlement" was made between the Zimmermans and South Falls. The interests of the participants were paramount, pressing, and thought to be of considerable financial significance to each. South Falls was a landlord with buildings under long term lease to defunct lessees. Worse, by one of today's fascinating arrangements involving sale and lease back of these two buildings to Eastern interests, South Falls had now become a lessee obligated under a lease and surety bond for the payment of $6500 per month to its new owner-lessor. Also, in the initial trade with the Zimmermans, a number of stores were to be constructed and leased, and two of the properties, one in Beaumont, Texas, the other Fort Wayne, Indiana, were apparently nearing completion and represented valuable leaseholds. And all the while the investment and risk were in the hands of corporations in which it had only a minority 25% interest controlled by owner-management (75%) which had so far been singularly unsuccessful. This made it important for South Falls to build up an enticing image for the stores so as to be able to sell its corporate stock.

But the tugs of self-interest did not end with South Falls or its leading lights, Cash, Peterson or Morris. The Zimmermans were quite aware that in their failure, they still had much which South Falls wanted. One thing was the 75% stock ownership in Giant Longview and Giant Wichita Falls. The other, and probably more important, was the power to exploit the leasehold value of the new properties in Beaumont, Texas and Fort Wayne, Indiana. But these forces did not stop there. The Zimmermans, in turn, were under heavy pressure from department lessees, especially Morse Shoes (Lesal) and Marrud (Di-Deb). It is perfectly obvious that these lessees were making dire threats, apparently in terms of wrongful appropriation of what the trade loosely refers to as "trust funds"

representing sales through the stores' cash registers. This was important to the Zimmermans as they were merchants, presumably of good standing, in other communities and planned further expansion. It was essential to their future business welfare to "purchase" the good will of these substantial "creditors" who, at that time were anything but happy. Thus the screws turned.

The result was one big trade. The Zimmermans agreed to sell their stock in Giant Longview and Giant Wichita Falls to South Falls (or its designee) in return for notes in the total amount of $50,000 and relinquishment of all rights to the Beaumont and Fort Wayne leaseholds. South Falls, on its part, in addition to the promissory notes for the stock also agreed to guarantee the full payment of specified creditors and particularly the amounts due Lesal and Di-Deb (note 4, supra). The guaranty was to be complemented by an indemnity to the Zimmermans, the effect of which was to impose the full and ultimate impact of these debts on South Falls. All of this was faithfully carried out.

Now tall in the saddle, South Falls, as it properly could, took over with dispatch. Existing local bank accounts were closed, new ones opened with nominees of South Falls alone authorized to draw checks. But not stopping there, South Falls caused to be organized a further entity, Giant Trading Corporation, all of the stock of which was subscribed for by minor functionaries of South Falls' staff, each of whom, though garbed in high sounding corporate titles, had absolutely no authority to do anything save carry out the directions of South Falls through its owner-director spokesman Cash and perhaps occasionally Peterson. In the meantime, on October 3 South Falls sent a letter to all creditors. One important part of this letter stated that any goods shipped to the two stores subsequent to September 25, 1962, would be paid for by South Falls.

It is the handling of funds by and through Giant Trading Corporation that

is the heart of this present appeal. Its bank account was opened about October 10 by a deposit of $50,000 represented by two checks of Giant Longview and Giant Wichita Falls. Between that date and November 21, when the account was closed with the advent of receivers in the reorganization proceeding (see note 2, supra), these transfers aggregated approximately $214,000.[5] Of this amount, the sum of $100,000 represented transfers from the Bankrupt Giants after the date of bankruptcy.[6] On October 18, Giant Trading paid South Falls $40,000, the check bearing the word "loan" but testimony of Cash and others described it as an installment payment on the debentures owed to South Falls. On October 25, Giant Trading paid South Falls $15,000 for rent for the two stores for the month of November, although the rent was not then yet due. Between October 11 and October 31, the date of bankruptcy, Giant Trading at the direction of South Falls also paid out approximately $47,033.52 to creditors (other than South Falls), but of this sum $39,878.97 went to the "guaranteed" creditors, such as Morse Shoes and Marrud. These pre-bankruptcy deposits and disbursements are not immediately involved, but in the light of the Referee's findings both as to payments to South Falls [7] and to favored creditors [8] which

5.

| Transferred From | Amount |
|---|---|
| Giant Longview | $106,997.91 |
| Giant Wichita Falls | 107,102.49 |
| | $214,100.40 |

6.

| Date | Amount |
|---|---|
| October 31 | $ 27,000.00 |
| November 6 | 25,000.00 |
| November 12 | 22,000.00 |
| November 16 | 26,000.00 |
| Total | $100,000.00 |

7. As to the $40,000 payment to South Falls, the Referee in ordering a turnover rejected the explanation of Cash and found that "this was in truth and in fact a transfer by South Falls Corporation from one corporate pocket to another in an effort to hinder, delay or defraud the creditors of the bankrupt corporation." This matter and preference rental payments was settled subsequently.

8. As to payments to other creditors, the Referee concluded that he did "not have summary jurisdiction with respect to funds which South Falls Corporation caused to be paid to creditors * * * prior to October 31, 1962." Presumably these are pending in plenary proceedings. The Referee characterized the action of South Falls and its guiding characters in these terms. The "* * * evidence discloses a studied and deliberate attempt on their part to stall the proceedings while they drained off the assets of the bankrupt corporation for their own use and benefit. On October 31, 1962, both Giant Stores * * * were hopelessly insolvent and the officers of South Falls Corporation were well aware of it. The answer denying insolvency and demanding a jury trial filed on November 9, 1962, was, therefore, not filed in good faith, but for the purpose of delay. * * *. Disregarding their fiduciary duties to the creditors as proprietor and controlling managers and directors of the insolvent Giant Stores, the responsible officers and directors of South Falls Corporation fraudulently and with no substantial basis of legal right diverted funds of the bankrupt corporations to themselves and to favored creditors for debts for which they were legally and responsible while they hindered and delayed the other creditors by stalling tactics."

are not here attacked, they are relevant in assaying the legally indefensible nature of the post-bankruptcy receipts and disbursements.

Completely indifferent to the commencement of the bankruptcy proceedings, South Falls through Giant Trading continued these activities without change. On November 20, rent was paid for both stores for December, although it was not yet due. And between November 8 and November 19, Giant Trading paid out $27,359.21 to creditors, but carefully confined to those creditors (and no others) as to whom South Falls had direct liability as a guarantor.[9]

■ On the basis of these facts and findings, the Referee ordered South Falls to turn over these sums amounting to $27,359.21 and $21,567.89. On this appeal, the order is attacked on the ground that the Bankruptcy Court did not have summary jurisdiction, and a plenary suit was required. Bolstering that jurisdictional attack is the further contention that there is no property in the custody of South Falls capable of being turned over. On the assumption that the Bankruptcy Court had summary jurisdiction, the order is further attacked on the ground that South Falls was not a transferee. And in any event, it is further asserted, these transfers or payments did not constitute voidable preferences because the ultimate recipients (a) merely obtained return of their own trust funds or (b) the sums were in payment of current purchases resulting in no depletion of the bankruptcy estate.

■ There can be no serious question about summary jurisdiction. This is not the case of funds or property in the custody of one other than the bankrupt on the date of bankruptcy. This is the case of a purposeful, deliberate, intentional transfer of funds belonging to the bankrupt estate after bankruptcy. Moreover, it is the case of the disbursement of such funds to the direct and immediate financial benefit of South Falls. The funds transferred by direction of South Falls to Giant Trading were either in the sole possession and control of the Bankrupt on the date of bankruptcy or were received thereafter in the course of the retail operations of the stores. South Falls got the effective control of these funds by ordering their transfer from the Bankrupt to its tool Giant Trading for disbursement to these preferentially selected payees. Whatever rights any-

9. Using the same identification as in the Referee's order and Court's decree, these were:

| Date | Payee | Amount |
| --- | --- | --- |
| (a) November 8, 1962 | Di-Deb | $ 1,929.38 |
| (b) November 19, 1962 | Lesal | 5,101.94 |
| (c) November 8, 1962 | Lesal | 2,250.29 |
| (d) November 19, 1962 | Lesal | 6,585.09 |
| (e) November 15, 1962 | Spencer Shoes | 4,996.64 |
| (f) November 17, 1962 | Spencer Shoes | 6,495.87 |
| | Total | $27,359.21 |

Similar funds were paid for Giant Wichita Falls:

| Date | Payee | Amount |
| --- | --- | --- |
| (a) November 8, 1962 | Di-Deb | $ 2,524.61 |
| (b) November 19, 1962 | Lesal | 5,101.93 |
| (c) November 8, 1962 | Lesal | 2,467.74 |
| (d) November 19, 1962 | Lesal | 6,585.09 |
| (e) November 15, 1962 | Lachman Rose, Inc. | 4,888.52 |
| | Total | $21,567.89 |

* Note: The amount should probably be $4,966.64; we may assume, as South Falls contends, that the payee was not Spencer, but rather Lachman Rose Company for toys purchased comparable to similar payment November 5 of $4,888.52 for toys at Giant Wichita Falls, item (e).

one or all of these ultimate payees might have had in resisting a demand by the Trustee for return of the sums received, South Falls had no right of any kind or character—except that of sheer power—either to have the funds or direct or control their use. Neither it nor its willing implement, Giant Trading, had either possession or claim to rightful possession. On the contrary, the sole and only party having any rightful claim to possession, custody, or control was the Bankrupt. On no possible basis or principle could South Falls justify the right to acquire or hold or control these funds either directly or through its instrument, Giant Trading. B. F. Avery & Sons Co. v. Davis, 5 Cir., 1951, 192 F.2d 255; Maule Industries, Inc. v. Gerstel, 5 Cir., 1956, 232 F.2d 294; Nicholas v. Cohan, 5 Cir., 1958, 255 F.2d 301. 2 Collier, Bankruptcy § 23.05 [5], at 491 (14th ed. 1962); see especially id. § 23.06 [1], at 497–98, n. 10 [hereinafter cited Collier].

■ The most that can be said for South Falls is that it had, as it did, a legitimate business interest in trying to salvage its heavy investment and the financial success of a tottering venture. Consequently, it was within its rights in exerting the control incident to its exclusive ownership over the handling of funds either by the Bankrupt or by a nominee such as Giant Trading. But in this role, whatever control or possession it had of the corporate bankrupt's cash and bank account was that of and for the Bankrupt itself.[10] Such possession or control would not be sufficient to clothe South Falls with the status of an adverse substantial claimant. 2 Collier, § 23.06 [3]; May v. Henderson, 1925, 268 U.S. 111, 45 S.Ct. 456, 69 L.Ed. 870; cf. Collier § 23.06 [3], at 504 n. 28; Sampsell v. Imperial Paper & Color Corp., 1941, 313 U.S. 215, 218, 61 S.Ct.

904, 85 L.Ed. 1293, reversing 9 Cir., 1940, 114 F.2d 49.

■ Before discussing the related aspect of the objection to summary jurisdiction—lack of effective present possession by South Falls of anything capable of being turned over—we think it simplifies matters to discuss the contention that, assuming summary jurisdiction, there were no voidable preferences since the ultimate recipients were entitled to them at that time and in the amounts received. If that were so, the bankrupt estate has not been adversely affected by South Fall's actions. The first is that items (a), (b), (c) and (d) at both stores, note 9, supra, constituted trust funds which were being restored to their rightful owner. The theory apparently is that under the lease agreements, sales of merchandise in the leased departments were to be run through Giant's cash registers with a periodic accounting and transfer of funds after deducting rental, commissions, and the like. When factually supported, there is, of course, legal basis for such a result. See, e. g., United States National Bank In Johnstown, Pa. v. Blauner's Affiliated Stores, 3 Cir., 1935, 75 F.2d 826; City of Dallas v. Crippen, 5 Cir., 1948, 171 F.2d 526, 529.

But the critical thing is the failure of South Falls to carry the burden imposed under § 70, sub. d(5), 11 U.S.C.A. § 110, sub. d(5) that one "asserting the validity of a transfer under this subdivision shall have the burden of proof * * *," and failing which "no transfer by or in behalf of the bankrupt after the date of bankruptcy shall be valid against the trustee * * *." No proof which the Referee was compelled to credit was offered to establish either the legal status as "trust" funds or, for that matter, the terms of the departmental lease contracts.[11] What little testimony there was was of a conclusory nature uttered

10. Cash, for South Falls, gave categorical testimony:
   "Q. This bank account [of Giant Trading] was at all times the bank account of the bankrupt corporation, was it not?

"A. Oh, yes, that is why it was formed."
This was confirmed by the testimony of Mr. Peterson.

11. The record does not contain copies of the leases either in testimony or exhibit

by witnesses having no particular competence in the field and most of whose testimony was utterly discredited by the trier. With nothing but vague statements by such witnesses as to what each "understood" or "thought," there is a complete absence of any factual testimony that any of these amounts represented sales of lease departments run through Giant's cash registers at any time subsequent to September 12, and certainly not subsequent to October 31. And to the contrary, it is overwhelmingly established that many of these were payments on guaranteed promissory notes (see note 4, supra) representing lease department sales made many, many months before. The trust theory, if it ever existed in legal fact could hardly run that far to infect properties long after acquired.

■ Negativing the charge of voidable preferences as to the remaining disbursements, South Falls contends that these were for current purchases ordered and acquired during bankruptcy for sales to customers in the regular course of business.[12] The theory is that the estate was augmented by the new merchandise and was not diminished by the payment of the purchase price.[13] But as was the case of the so-called "trust funds," South Falls utterly failed to carry the day. Not a single invoice was offered, and only vague testimony from Martin, who was thoroughly discredited, Pill, who had only limited functions, and Peterson, who professed to have taken little day-to-day interest in the problems, undertook to suggest that these deliveries were made by the suppliers to the Bankrupt subsequent to

bankruptcy as sales to, and for payment by, it rather than South Falls. More important, South Falls by its letter of October 3 expressly guaranteed the payment of all invoices for shipments made after September 25. Consquently, as we discuss more fully later on, these disbursements were for the immediate direct financial advantage of South Falls to relieve it against its guaranty.

■ This brings us back to the question of whether, conceding summary jurisdiction, the turnover relief here sought is an available or appropriate order. The attack rests on the assertion that, conceding misapplication or misappropriation of bankrupt funds by South Falls, the bald fact nevertheless is that South Falls no longer has possession of the funds, and hence has nothing to turn over. In support of this beguiling thesis, South Falls stresses, as it naturally would, Maggio v. Zeitz, 1948, 333 U.S. 56, 68 S.Ct. 401, 92 L.Ed. 476.

■ That case, arising as it did from the second phase of a turnover order—compliance and enforcement—concluded that the awesome sanction of coercive civil contempt could not be employed to compel the doing of an act no longer within the respondent's capabilities. Accepting, as we must, the Maggio approach that a turnover proceeding " * * is essentially a proceeding for restitution rather than indemnification, with some characteristics of a proceeding in rem; [and that] the primary condition of relief is possession of existing chattels or their proceeds capable of being surrendered by the person ordered to do so," 333 U.S. 56, at 63–64, 68 S.Ct. 401 at 405, 92 L.Ed. 476, it offers no solace to South Falls.

form. This being an element of South Falls vicarious "adverse claim," it is not sufficient merely to state as does South Falls in its brief (page 11, note 5) that "these leases were available for examination in the bankruptcy court" and this would have revealed the quoted leased provisions. See Spach v. Johnina, Inc., 5 Cir., 1961, 291 F.2d 619; Kohn v. Myers, 2 Cir., 1959, 266 F.2d 353.

12. These are payments to Lachman Rose supposedly for toys, Giant Longview item (e) and Giant Wichita Falls item (e), note 9, supra.

13. South Falls urges such cases as Jaquith v. Alden, 1903, 189 U.S. 78, 83, 23 S.Ct. 649, 47 L.Ed. 717; In re Fred Stern & Co., Inc., 2 Cir., 1931, 54 F.2d 478, 480; Marshall v. Florida National Bank of Jacksonville, 5 Cir., 1940, 112 F.2d 380.

■ Several factors may be briefly emphasized. At the outset, summary jurisdiction being established, the problem becomes essentially one of the appropriate relief. Under General Order 37, the Federal Rules of Civil Procedure are adopted for bankruptcy proceedings insofar as they are not inconsistent with the Act or the general orders. Georgia Jewelers v. Bulova Watch Co., 5 Cir., 1962, 302 F.2d 362, 366. That in turn brings into play F.R.Civ.P. 54(c) which lays down the standard that except for default decrees the form of relief and the nature of the order to be entered is to be determined by what the facts establish, not what the lawyer prays for. Travelers Ins. Co. v. Busy Elec. Co., 5 Cir., 1961, 294 F.2d 139, 144; Demandre v. Liberty Mutual Ins. Co., 5 Cir., 1959, 264 F.2d 70; Carss v. Out-Board Marine Corp., 5 Cir., 1958, 252 F.2d 690, 693, 1958 AMC 638; Camilla Cotton Oil Co. v. Spencer Kellogg & Sons, Inc., 5 Cir., 1958, 257 F.2d 162, 167; Smoot v. State Farm Mutual Automobile Ins. Co., 5 Cir., 1962, 299 F.2d 525, 530; Shull v. Pilot Life Ins. Co., 5 Cir., 1963, 313 F.2d 445, 447. Starting from this vantage whether the decree entered below is in the form of a traditional turnover order or its equivalent as an order for accounting because South Falls presumed to act for the Bankrupt (see note 10, supra), under May v. Henderson, 1925, 268 U.S. 111, 45 S.Ct. 456, 69 L.Ed. 870, the facts fully justify the relief granted.

■ The facts, uncontradicted and glaring, are far from showing either that South Falls (through its willing tool, Giant Trading) has been a mere conduit of funds into the hands of the ultimate recipients or that the Bankrupt's property has been dissipated leaving nothing in its place. Both as to current purchases (see note 12, supra) and as to the so-called lease department "trust funds" (see note 9, supra), South Falls was an outright guarantor. Had not the accounts been satisfied by application of the Bankrupt's funds, South Falls—either directly to the vendors shipping goods after September 25 or indirectly through the Zimmermans as to "trust" funds—would have been compelled to pay these items. South Falls was, and is, therefore better off dollar for dollar. Had not the Bankrupt's dollar been transferred, South Falls would have parted with one of its own. That dollar would have come from its own cash or by liquidation of its ample assets. In effect, it now has a dollar, either in cash or property, which it would not have had but for the transfer of bankrupt funds. Of course, where the misappropriation is that of money, equitable concepts analogous to "tracing" do not require identification of precise dollars as they go through various commercial mutations. The result is that Maggio now turns against South Falls. Turnover relief is proper, that case held, where " * * * existing chattels or their proceeds" are available. 333 U.S. 56, 63. Here the "proceeds" of the cash are the remaining assets saved by this misappropriation of bankrupt funds. See also May v. Henderson, 1925, 268 U.S. 111, 119 45 S.Ct. 456, 69 L.Ed. 870; In re Livingston, N.D.Calif., 1950, 93 F.Supp. 173, 175. To the full extent of such saving, the remaining assets or their subsequent mutations are available for compulsory turnover. And since South Falls, as one who knowingly misapplied, if not misappropriated bankrupt funds, thereby became an involuntary vicarious fiduciary, the tracing will permeate every asset to the point where this would exhaust the value of all assets as of the date of the turnover order. Of course, within the standards here prescribed, whether South Falls has complied, or can comply, are matters properly reserved for compliance-enforcement proceedings. Maggio v. Zeitz, supra.

The turnover order was substantively justified and the relief granted was procedurally appropriate.

Affirmed.