In the Matter of GLOBAL INTERNATIONAL AIRWAYS CORPORATION, Debtor.

GLOBAL INTERNATIONAL AIRWAYS CORPORATION, By and Through its UNSECURED CREDITORS COMMITTEE, Plaintiffs,

v.

Farhad AZIMA, Global International Airways Corporation, and Middle East Leasing Corp., Defendants.

Bankruptcy No. 83–02765–2–3–11. Adv. No. 87–0034–2–3–11.

United States Bankruptcy Court, W.D. Missouri, W.D.

Feb. 25, 1987.

Ronald S. Weiss, Berman, DeLeve, Kuchan & Chapman, Kansas City, Mo., for plaintiffs.

Howard D. Lay, Dysart, Taylor, Penner & Lay, Daniel J. Flanigan, McDowell, Rice & Smith, Kansas City, Mo., for defendants.

## MEMORANDUM OF FINDINGS OF FACT, CONCLUSIONS OF LAW SUPPORTING ISSUANCE OF PRELIMINARY INJUNCTION

DENNIS J. STEWART, Chief Judge.

The within adversary action came on before the court for hearing on February 19, 1987, on the issue of whether a preliminary injunction should be issued restraining and enjoining the defendants from transferring or otherwise disposing of some of their property pending the determination of the action which, in pertinent part, seeks turnover to the debtor's bankruptcy estate of the value of certain allegedly unlawful postpetition transfers. Previously, on January 30, 1987, this court had issued its temporary restraining order against the defendants to the following effect:

"(I)t is ordered that Farhad Azima, Global International Airways Corporation, and Middle East Leasing Corporation, their agents, employees, and all persons holding property for any of them or acting in concert with any of them, are prohibited from transferring, disposing of, or encumbering any of the property listed below except in accordance with further order of this Court:

(a) All assets acquired from the debtor-in-possession or Global International Airways Corporation, other than its FAA Certificate, its corporate stock, and its office furniture and equipment; the property not to be transferred or disposed of includes all jet engines acquired from the debtor-in-possession or Global International Airways Corporation, and all spare parts which were or are stored at 301 E. 51st St., Kansas City, Missouri; a Boeing 707. No. 20179, N8440; and any ownership interest of whatsoever nature or form which Farhad Azima has in 301 Leasing or Aviation Leasing Group, which respectively owns the former Global Office Building which were leased to Global ...."

At the time of the issuance of that temporary restraining order, counsel for the defendants expressly waived the ordinary 10–day limitation on its effect in favor of holding the hearing on the issue of the granting or denying of a preliminary injunction. The court accordingly set the hearing on that issue for February 17, 1987. On the eve of that scheduled hearing, however, the defendants posed a challenge to the propriety of representation of the plaintiff by Paul Sinclair, Esquire, on the grounds that his representation of another creditor made it impossible for him to represent the debtor, or its unsecured creditors' committee, without involving a conflict of interest. Because of this challenge, in order to resolve it before commencing on with the case, the court reset the hearing on February 19, 1987. At the inception of the hearing of February 19, 1987, for the reasons which are further stated in the following marginal note, the court ruled that the challenge to Mr. Sinclair's representation of the plaintiff should be denied.[1]

---

**1.** Section 1103(b) of the Bankruptcy Code currently provides that "(r)epresentation of one or

Subsequently, on February 19, 1987, and the following date, February 20, 1987, the hearing on the preliminary injunction issue was held. The evidence which was then adduced warrants the following findings of relevant fact.

The debtor's petition for relief under chapter 11 of the Bankruptcy Code was filed on October 20, 1983. For a period of nearly two years thereafter, the debtor was left in possession without proposing any viable plan of reorganization. At length, in late 1985, a third amended plan was submitted to the court and creditors. To summarize its contents briefly in portions which are now material, it provided for the sale of certain assets of the debtor to an "investor," the defendant Farhad Azima for a purchase price of about $1,218,000. Which of the assets were to be transferred to Mr. Azima for this purchase price is the matter of principal controversy in this action. Certain other assets of the debtor corporation were to be liquidated for the benefit of creditors. This included chiefly causes of action for the recovery of alleged preferential transfers to the creditors of the debtor. In the disclosure statement which the debtor submitted in conjunction with this proposed plan, the value of these causes of action was vastly overstated, particularly in view of the recoveries which have taken place and the potential recoveries which now exist.[2] The disclosure statement, further, adverted to an existing agreement between the creditors' committee and Mr. Azima under which certain assets were to be purchased by Mr. Azima

for the aforesaid $1,218,000.[3] The reference in the disclosure statement was as follows:

"Subject to confirmation of the Plan, Global has agreed to sell all of its stock, its tangible assets and its FAA Certificate to the Investor (Farhad Azima) for the sum of ... $1,218,000 ... pursuant to the Agreement of Intent for Plan of Reorganization attached hereto and incorporated herein by reference as Appendix A."

As observed above, Appendix A included a description of the general assets of the debtor corporation.[4] Further, according to the evidence which has been adduced in the hearing of this case, the schedules contained a fair and accurate description of the assets of the debtor at the time of the filing of the petition for relief. The Appendix A in which the property to be purchased by Mr. Azima was said to be described with particularity, however, was not attached to the disclosure statement, nor to the proposed third amended plan of reorganization. Nor was it in any manner disclosed, according to the evidence now before the court, in the course of the confirmation procedures which followed. Despite the absence of any definite description of the assets which were to be sold to the "investor," Mr. Azima, the court, in the person of former bankruptcy judge Joel Pelofsky, in an order entered on September 11, 1985—apparently without any hearing such as was required by the governing procedural rules [5]—finding it to be suffi-

more creditors of the same class as represented by the committee shall not per se constitute the representation of an adverse interest." Further, the other objections to Mr. Sinclair's representing the unsecured creditors' committee in this particular adversary seem to dissipate when it is considered that his client is not a defendant in this action and his duties are narrowed at the present time to this specific action. Aside from his affidavit on the temporary restraining order—made in compliance with Rule 65, F.R.Civ. P.—which will not be admissible at trial, Mr. Sinclair is not, as the defendants contend, a necessary witness in the trial of this action.

2. Further, it must be observed that most of the recoveries will go to pay attorney's fees and the costs of administration and that little, if any, will be distributed to the general creditors.

3. There is no indication in any of the evidence before the court at the present time that the court ever approved this agreement.

4. But the evidence is not unequivocal as to whether it fairly described all the assets of the corporation, although that, for the reasons stated in the text of this memorandum, is an immaterial consideration.

5. The order recites that "(t)he Court has reviewed the Disclosure Statements of Debtor and of the Creditors Committee and they are APPROVED." Cf. Rule 2002(b) of the Bankruptcy Rules, appearing to require a hearing on the sufficiency of the disclosure statement.

cient. Subsequently, a hearing on the issue of confirmation was held on October 30, 1985. Prior to the commencement of that hearing, the creditor United States of America submitted written objections to confirmation. In those objections, it contended that the proposed plan of reorganization violated the "absolute priority rule" in that the stockholders of the debtor corporation, Mr. Azima and Mansour Rasnavad, would retain an interest in the debtor without paying the other creditors 100% of their outstanding claims.[6] The United States further objected to the effect that the disclosure attendant to the proposed plan did not sufficiently describe the property to be sold to Mr. Azima nor reveal its value.[7]

In the confirmation hearing which was consequently held, the proponent of the plan maintained that there was no violation of the absolute priority rule; that Mr. Azima and Mr. Rasnavad were retaining no interest in the debtor because their stockholdings were being cancelled pursuant to the plan; and that stock in a new corporation—also named Global International Airways Corporation—was being issued. · It was part and parcel of this argument that the "new" corporation was paying into the chapter 11 estate the value of the property which it was taking out of the estate by reason of a sale to the "investor," Mr. Azima. In support of this proposition, the proponents of the plan contended to the court that the value of all of the tangible assets of Global International Airways Corporation were "less ... than the amount being offered by the investor in this case and contemplated by the plan."[8] Counsel for the unsecured creditors' committee,

Ronald Weiss, spoke to this contention as follows:

"Your Honor, the only comment the committee has at this point is Mr. Lewandowski alluded to the fact that pursuant to this Court's order we retained the services of Avmark, Ltd., a nationally recognized brokerage and appraisal service for aircraft in Miami, Florida. They prepared an extremely detailed appraisal of the aircraft, and the amount that they estimated, the *valuation of the aircraft,* is slightly less than the proposal under the plan...." (Emphasis added.)

Thereafter, the court heard evidence on the issue of the valuation of the assets of the debtor. An appraiser named Ray Adams, on behalf of the proponents of the plan, testified that the aircraft alone had a value of $1,263,000. He stated that, otherwise, the debtor had some "parts inventory, rotable and expendable parts, and furniture, fixtures and equipment ... (which) are not material to the value of the assets of the company. The aircraft are the most substantial assets that the company has."

After the conclusion of the confirmation hearing, Judge Pelofsky, on November 13, 1985, issued a "memorandum opinion and order" confirming the proposed plan of reorganization (and liquidation). In the course of that "memorandum opinion and order," with respect to the property which was to be granted to Mr. Azima, Judge Pelofsky relevantly stated as follows:

"The plan does not contemplate that debtor will continue to be in business. Rather *the airplanes and the FAA certificate* are to be sold to an investor for $1,218,000 ..." (Emphasis added.)

\*     \*     \*     \*     \*     \*

6. Cf. note 2, *supra.*

7. See the "Defendants' Trial Brief: Effect of Order of Confirmation" to the following effect: "In reviewing the files last evening, however, the undersigned counsel (for defendants) did find one creditor who did notice the problem and cared enough to direct Judge Pelofsky's specific attention to it. This was the United States Government in the person of its counsel, Gene Harrison. On the first page of Mr. Harrison's 'Objection of the United States of America to the Debtor's Third Plan of reorganization', which was filed with the Court and hand delivered to 'all interested parties' at the confirmation hearing, he stated: 'Nor does the United States' copy of the disclosure statement have Appendix A attached to it.' Moreover, on page 4 of the Objection Mr. Harrison called specific and emphatic attention to the fact that 'The debtor is to be discharged and the investor is to be transferred all assets free and clear of all claims.' "

8. The quotation is of the statement of debtor's counsel made in the course of the confirmation hearing of October 30, 1985.

"Here the investor must purchase the shell of the corporation which holds the certificate. He is also purchasing the airplanes. In essence, the investor will have the old Global, *without any assets other than the certificate and the airplanes.*" (Emphasis added.)

With respect to the "absolute priority rule" issue, Judge Pelofsky stated as follows in his "memorandum and order" of November 13, 1985:

"If a junior class retains an interest while a senior class is not paid in full, the absolute priority rule is violated and the plan cannot be confirmed ... The investor will be paying a substantial sum for the assets he is getting. The liquidation analysis, performed on behalf of the Unsecured Creditors' Committee, shows that the cash to be paid is in excess of the value of the airplanes. No value was assigned to the (FAA) certificate.... The Court finds that the shareholders are not retaining an interest in the debtor. The outstanding stock is being surrendered. The debtor will not operate a business after reorganization but will only collect and disburse funds. Although the investor is the same person as the principal shareholder of the debtor, he will not have an interest in the debtor after reorganization. His interest in Global, called that only to retain the continuity of the certificate holder, will be the result of a cash investment and the issuance of new stock."

Pursuant to the confirmed plan of reorganization, the evidence offered in the course of the hearing of the action at bar, shows that the defendant Farhad Azima has obtained more than the airplanes which seem to have been the assets intended to be conveyed to him by the plan of reorganization and the court's order confirming it.[9] Rather, the evidence tends to show, Mr. Azima has received other assets—engines, parts and the like—which may have a value exceeding $500,000.[10] He has disposed of some of the articles for his benefit, or that of related entities [11] and some of the dispositions were made after September 1986 when it should have been known that an investigation had been commenced into the location and existence of assets of the debtor other than the three airplanes which were to be sold to Mr. Azima under the order of the court confirming the plan of reorganization.[12]

### Conclusions of Law
### Jurisdiction

The defendants have posed an objection to the jurisdiction of the bankruptcy court, contending that the action should be withdrawn under the provisions of section 157(d), Title 28, United States Code, to the district court. It is stated and contended by the defendants that the actions at bar are, at most, actions "related to" a bankruptcy case and that they cannot be heard by the bankruptcy court because it is their intention to demand a jury trial on all issues. The objection may be well founded with respect to the causes of action asserted other than that for the return of unauthorized postpetition transfers pursuant to section 549 of the Bankruptcy Code. With respect to the non-section 549 actions, therefore, this court is contemporaneously transmitting a report and recommendation to the district court, pursuant to section 157(c), Title 28, United States Code, that the reference of the actions to the bankruptcy court be withdrawn in favor of district court jurisdiction, *on condition that*

9. Which, as observed above, seems to restrict the property to be transferred to the "investor" to the "FAA certificate and airplanes."

10. The evidence which is based on the estimates of Mansour Rasnavad's estimates of possible value of the articles would show that the value of the additional property ranged in the vicinity of $544,000.

11. According to the evidence adduced before this court, some of the articles could not perfectly be traced; nor could their proceeds, at the present time.

12. Counsel asserts that there was no "sneakiness" involved in these recent transfers, and Mansour Rasnavad testified that the transfers were based upon inquiries received prior to the September 1986 investigation. But they are nevertheless recent, and this court deems it a sufficient showing of threatened irreparable injury if property—which may be property of the estate—has been transferred under the claim of right which has in fact been advanced in this adversary action.

*demands for jury trial are timely and appropriately made;* otherwise, the actions may be remanded to the bankruptcy court for the hearing and making of recommended findings of fact and conclusions of law to the district court.

With respect to the action for turnover under section 549, however, there can be no question that actions for the recovery of assets of an estate which were transferred subsequent to the petition has always been considered within the "summary" or "core" jurisdiction of a bankruptcy court. Section 157(b)(2), Title 28, United States Code, provides that "orders to turn over property of the estate" are part of the "core" jurisdiction of the bankruptcy court. And, under the historical precedents, a bankruptcy court always had summary jurisdiction to recover assets of the estate which were transferred after bankruptcy.[13] Any other rule would make it impossible for the court of bankruptcy to protect the assets of an estate in accordance with its assigned duty. This court therefore rejects the proposition that the section 549 claim is without the "core" or "summary" jurisdiction of the bankruptcy court.

The same is true with respect to the jurisdiction and authority of the court to issue a preliminary injunction or other relief to ensure that the assets of a reorganization estate, or their replacements, are not disposed of pending a determination of whether they are truly assets of the title 11 estate. "It is well established that the bankruptcy court has the power and duty to enjoin disposition of assets held by third parties pending a determination of the estate's right to turnover." *Matter of E.C. Bishop & Sons, Inc.,* 32 B.R. 534, 537, n. 3 (Bkrtcy.W.D.Mo.1983), and authority there cited. And generally, a reorganization court has "inherent" authority to issue injunctive relief to protect the assets or potential assets of a debtor entity. See, e.g., *Diners Club v. Bumb,* 421 F.2d 396, 398 (9th Cir.1970):

"Upon the filing of the petition, all property in the possession of the debtor passed into the custody of the reorganization court, and became subject to its authority and control. In the exercise of its jurisdiction over the debtor's property, the court had power to issue injunctions and all other writs necessary to protect the estate from interference, and to ensure its orderly administration. ... This ancillary jurisdiction of the reorganization court flows not only from express provisions of statute ... but from the inherent power of a court of equity to protect its control of a res in its custody."

Accordingly, this court rejects the contention that it does not have the jurisdiction and power to issue the preliminary injunction which is requested in the action at bar. For the reasons which the court previously stated at the conclusion of the hearing of February 20, 1987, the scope of the injunction may be broad when a postpetition transfer is involved. For, under the applicable principles, the assets of the recipient of a postpetition transfer stand as replacements for any transferred property which may have been disposed of before the turnover order is issued. See, e.g., *South Falls Corp. v. Rochelle,* 329 F.2d 611, 619 (5th Cir.1964), to the following effect:

"Had not the Bankrupt's dollar been transferred, (the transferee) would have parted with one of its own. That dollar would have come from its own cash or by liquidation of its ample assets. In effect, it now has a dollar, either in cash or property, which it would not have had but for the transfer of bankrupt funds ... To the full extent of such saving, the remaining assets or their subsequent mutations are available for compulsory turnover."

Accordingly, the objections to jurisdiction of the bankruptcy court, with respect to the section 549 action, and to the power of the bankruptcy court to issue an injunction of the same breadth as the restraining order are denied.

13. See *Matter of Citizens Loan and Savings Co.,* 5 B.R. 510, 514, n. 16 (Bkrtcy.W.D.Mo.1979). "There can be no serious question about summary jurisdiction. This is not the case of funds or property in the custody of one other than the bankrupt on the date of bankruptcy. This is the case of a ... transfer of funds belonging to the bankrupt estate after bankruptcy." *South Falls Corp. v. Rochelle,* 329 F.2d 611, 616 (5th Cir.1964).

*Issuance of a preliminary injunction*

█ This court has concluded that the facts found above warrant the issuance of the preliminary injunction. The fact of transfers subsequent to September 1986 of property which may well be property of the estate under the plaintiff's contentions sufficiently demonstrate the threat of irreparable injury which the authorities hold to be a prerequisite to the issuance of a preliminary injunction.[14] Given the seemingly unequivocal statements in the order of confirmation that would indicate that only the "FAA certificate and airplanes" were to be transferred to Mr. Azima for the sum of $1,218,000 and certain other consideration, this court could not say that there is not a likelihood of success on the merits of plaintiff's section 549 action. Although counsel for the defendants has vigorously objected on this point, the evidence which has been adduced seems to this court to make it clear that the likelihood of "success on the merits" is "probable" within the meaning of *Dataphase Systems, Inc. v. C.L. Systems, Inc.,* 640 F.2d 109, 113 (8th Cir.1981). Counsel for the defendants has raised, in extensive briefs which he has filed with the court, objections on this point which he seems to claim prohibit recovery as a matter of law. But, on these issues as well, the court believes that there are issues of fact which are involved on which there is a reasonable likelihood of success for the plaintiff. Thus, counsel contends that Judge Pelofsky's order must be regarded as one which simply confirmed the plan of reorganization in its entirety, together with its authorization that all of the assets of the debtor corporation be transferred to Farhad Azima. But this conclusion can be reached only if the court decides to disregard the seemingly unequivocal language, adverted to above, that only the "FAA certificate and airplanes" were to be transferred. And further, when there was evidence before the court that the airplanes were worth as much or more than the $1,218,000 paid therefor, for this court to hold that Judge Pelofsky's order must be read to include other property may well

make it illegal. For it is required that a chapter 11 plan grant to creditors at least the amounts which they would receive in straight liquidation under chapter 7. Under the evidence which presently exists, if more than the FAA certificate and airplanes were intended to be transferred for $1,218,000, this tenet of bankruptcy law may well have been violated. "In construing a judgment, it may be presumed that the court intended to render a valid ... judgment." 46 Am.Jur.2d Judgments section 74, p. 364 (2d ed. 1969). It is, of course, open to the defendants to present the testimony of Judge Pelofsky in the forthcoming hearing of the merits and perhaps conclusively prove the contrary. "The mere interpretation of a judgment involves no challenge to its validity ... (T)he general rule precluding a collateral attack upon a judgment does not prevent the interpretation of a judgment which is incomplete or ambiguous upon its face, or an explanation of the judgment by parol evidence." Id., sec. 72, p. 363. But, until such testimony is presented, the court must hold that the plaintiff has a reasonable likelihood of prevailing on the merits.

The same principles appear to apply to the contention of counsel for the defendants that there could have been no transfer within the meaning of section 549 because there were not "two Globals" but rather only one. As has been seen above, without the concept of the two corporations, the issuance of new stock in the "new Global" could not be used as the artifice to hold that the absolute priority rule was not violated by the retention of any stock in the "old Global" by Mr. Azima and Mr. Rasnavad.

And the defendants go to great lengths to argue that the court cannot have any control over the property which is the subject of this action because, under section 1141(b) of the Bankruptcy Code purports to revest all property in the debtor as of the date of confirmation, after which the property is solely in control of the debtor, beyond the power of the court. Again, this contention seems to be contrary to the ex-

---

14. "Irreparable injury is the sine qua non for the grant of a preliminary injunction." *United States Postal Service v. Brennan,* 579 F.2d 188, 191 (2d Cir.1978).

press provisions of the confirmed plan which reserves jurisdiction to the court to determine just such a controversy as that at bar. Further, section 1141(b) does not provide that there can be no control by the court if the plan or the order confirming the plan provides otherwise. And it was the order of the court in confirming the debtor's plan that the property not transferred pursuant to its authority be liquidated for the benefit of creditors. In accordance with the foregoing principles, only such a provision may have made the order lawful.

The court therefore concludes, for the purpose of issuing a preliminary injunction, that the plaintiff has a likelihood of success on the merits within the meaning of the governing decisions.

"Whether a preliminary injunction should issue involves consideration of (1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." The preliminary injunction will be phrased, as was the restraining order, to minimize or eliminate any potential injury to the parties litigant by permitting disposition or transfer of property with prior written permission of the court. And, as for the "public interest," it seems patent to this court that if, as the evidence now *suggests*, the defendants, or some of them, received assets of the bankruptcy estate without authorization and far in excess of what they paid for, a court system which put its imprimatur on such action and failed further to inquire into the merits of the action, while ensuring the status quo, would be subject to justifiable criticism.

The defendants also cite cases which hold that a preliminary injunction should not be issued where there is an adequate remedy at law simply to recover monetary damages. "For purposes of a preliminary injunction, an injury is 'irreparable' if it cannot be undone through monetary remedies." *United States v. State of Texas,* 628 F.Supp. 304, 313 (E.D.Tex.1985). If

this is the correct rule, the plaintiff in this case has met its demands by demonstrating that, if the property which belongs to the estate is transferred, it may never be recovered.

Accordingly, for the foregoing reasons, the preliminary injunction, as announced in open court on February 20, 1987, will be issued.