**In the Matter of GLOBAL INTERNA-TIONAL AIRWAYS, CORPORATION, Debtor.**

**Bankruptcy No. 83–02765–2–3–11.**

United States Bankruptcy Court, W.D. Missouri, W.D.

Jan. 22, 1988.

James F.B. Daniels, Husch, Eppenberger, Donohue, Cornfield & Jenkins, Kansas City, Mo., for applicant.

DENNIS J. STEWART, Chief Judge.

The law firm of Locke, Purnell, Rain and Harrell filed an application for an award of attorney's fees in the sum of $61,573.50 and reimbursement of expenses in the sum of $6,091.74. They state that the application is filed by them in their capacity as general counsel for the chapter 11 debtor, pursuant to an order of appointment made by former Bankruptcy Judge Pelofsky on November 28, 1983. The services for which compensation is sought are said to have been rendered during a period of time dating from November 13, 1985, to July 31, 1987. Aside from a few hours which are alleged to have been spent communicating with former Judge Pelofsky concerning the Government's objections to confirmation of the debtor's chapter 11 plan—a documentation which is so inadequate that it does not even dispel the possibility of the communication's being *ex parte* and illegal [1]—the great, overwhelming majority of the services for which compensation is sought were rendered in opposing the creditors' committee's application for appointment of Paul Sinclair, Esquire, as special counsel for the purpose of seeking recovery of certain aircraft and their parts for the benefit of the

---

1. Thus, the detailed statement submitted in support of the application begins with two hours on November 13, 1985, devoted to "[v]arious telephone conferences with Azima, Assistant U.S. Attorney *and* telephone conference with Judge Pelofsky regarding government's objections to confirmation."

chapter 11 creditors from the former chief executive officer of the debtor, Farhad Azima.[2] The creditors' committee has consequently opposed the granting of attorney's fees, stating in pertinent part that:

> "[t]he efforts to oppose the Court's appointment of special counsel were not successful. Special counsel was appointed and instituted litigation pursuant to the Court's Order against Farhad Azima (and entities in which Mr. Azima had an interest), the former principal of the Debtor and purchaser of the Debtor's assets. Ultimately, a settlement was reached between Mr. Azima and the estate which produced a substantial recovery."

A plenary hearing was held on the issues made by the application, on December 1, 1987. At that time, the material factual contentions made by the applicants were: (1) that they had not been retained by Farhad Azima and had never received any attorney's fees from him; and (2) that their opposition to the appointment of special counsel constituted efforts rendered, "in aid of administration of the estate," within the meaning of the governing authorities,[3] because special counsel appeared to be in the process of being appointed for the "unlawful" purpose of setting aside the order of confirmation which had been entered by former Judge Pelofsky. Under oath, John Flowers of the applicant law firm further stated to the court that it was not Farhad Azima who recruited him for the purpose of opposing Mr. Sinclair's appointment as special counsel, but rather that Howard Lay of the law firm of Dysart, Taylor, Penner and Lay, purporting to act as counsel for the debtor, was the person who actually issued the invitation. Otherwise, as material, the applicant law firm relied upon the detailed statement of services which is attached to their application and which will be enlarged upon and analyzed below.

█ The initial contention of the applicants—that they were never paid or retained by Farhad Azima—is of critical importance in this matter because, at virtually all times in question, the interests of Farhad Azima were pronouncedly opposed to those of estate administration. Judge Pelofsky's order of confirmation, entered on November 13, 1985, permitted Mr. Azima to keep the principal assets—or what, at the time, were considered to be the principal assets—for a payment of $1.2 million for the benefit of creditors. And the same order, in an apparent attempt to circumvent the "absolute priority rule" (under which Mr. Azima could not have kept corporate assets without paying all creditors 100%[4]), authorized issuance of new stock in a new "reorganized Global" corporation.[5] This is a provision which has given rise to a great deal of confusion and has permitted counsel to assert that they are representing "Global" even when also representing

---

**2.** Applicant counsel claim a total of 373.1 lawyer hours (ranging up to $225 per hour for approximately half of those services, an hourly rate which is more than twice that charged by lawyers of at least equal status in local practice) and 144.3 hours by "paralegals and clerks." These totals—and the sums requested therefor—seem astronomical when one considers that they were concentrated on one small issue, that of whether special counsel could be appointed and, further, were to no avail. But the detailed statement purports to show that all but about 10 hours were spent on the special counsel issue.

**3.** "Under the Act, in order for the debtor's attorney to be entitled to any award of compensation from the estate, the services were required to be rendered 'in aid of administration of the estate,' ... presuppos[ing] [not] a benefit to the estate as such, but to its administration ... The Code makes no change in this regard." 2 Collier on Bankruptcy, Section 330.04, pp. 330–22, 330–23 (15th ed. 1987).

**4.** As Judge Pelofsky himself stated in his order of confirmation of November 13, 1985, "if a junior class retains an interest while a senior class is not paid in full, the absolute priority rule is violated and the plan cannot be confirmed." And see Section 1129(b)(2)(B)(ii) of the Bankruptcy Code.

**5.** Accordingly, Judge Pelofsky found "that the shareholders are not retaining an interest in the debtor." Yet, when the court previously questioned the propriety of the law firm of Dysart, Taylor, Penner and Lay representing the estate which was being collected even though they also represented the "reorganized Global" (which admittedly is identical to Farhad Azima), that firm contended that there was no title 11 estate independent of the "reorganized Global."

Mr. Azima, because of his identification with the "reorganized Global." [5a] Under this set of dubious circumstances, Mr. Sinclair, in 1986, made assertions that he had uncovered evidence of the existence of assets in addition to those described in former Judge Pelofsky's order of confirmation, assets which had a value which, combined with the value of the assets granted to Mr. Azima by Judge Pelofsky, greatly exceeded $1.2 million.[6] When this was brought to the attention of the creditors' committee, they sought to have Mr. Sinclair appointed as special counsel for the purpose of recovering the value of these additional assets.[7] It was then that the applicant law firm became joined in the affray, opposing the appointment of special counsel in a hearing of about an hour's duration held in this court on October 28, 1986, opposing the appointment of special counsel on the ground that Judge Pelofsky's order of confirmation, as a matter of law, left the bankruptcy court without any residual jurisdiction in the matter.[8] (Apparently, the contention that the appointment of special counsel constituted an unlawful attempt to vacate Judge Pelofsky's order of confirmation came to applicant counsel as a kind of afterthought.) Then, when this court denied the objections and appointed Mr. Sinclair as special counsel, applicant counsel took an appeal from that order and prosecuted the appeal until the settlement was reached between the creditors' committee and Farhad Azima which terminated the proceedings. The appeal was not only unsuccessful, but, by reason of applicant counsel's failure to obtain a stay of the bankruptcy court's order pending appeal, Mr. Sinclair had prosecuted the action in the bankruptcy court to a conclusion which was favorable to the bankruptcy estate—all over the opposition, albeit ineffective, of applicant counsel. The monies which were resultingly paid by Farhad Azima into the estate now compose the principal quantum of that estate from which applicant counsel propose to recapture their attorney's fee. In essence, then, they expect to be paid from the settlement fund produced by the special counsel whose appointment they opposed.

It is precisely under such circumstances that the law's requirement that debtor's counsel be compensated from the estate only reasonable amounts attributable to services rendered "in aid of administration" thereof has special application. Under this rubric, an unbroken chain of authority holds that services rendered for the benefit of a debtor only, and contrary to the interest of the estate, such as opposing the issuance of a turnover order, cannot be compensated from the estate.[9] Based upon this eminent and well established principle alone, the court would be compelled to deny the application at bar, even without determining whether applicant counsel were working in the interests of Mr. Azima at a time when those interests were directly opposed to those of the estate.[10]

■ Nevertheless, facts which were disclosed to the court after the hearing, by means of a telephone call from local counsel for the applicant law firm, provide a separate and independent reason for denying the application of applicant counsel— that counsel were in fact previously paid by Farhad Azima. In his telephone call to the court of December 3, 1987, Mr. Daniels stated that Mr. Flowers' testimony that he had received no prior payment from Mr. Azima had been in error; that, indeed, Mr. Azima had provided an initial deposit of $50,000 to the applicant law firm, and that at least some sums had been paid from that

**5a.** See note 5, *supra.*

**6.** As was previously shown, the additional articles received by Mr. Azima appeared to have a value exceeding $544,000. See *Matter of Global International Airways Corp.,* 76 B.R. 700, 704, n. 10 (Bkrtcy.W.D.Mo.1987).

**7.** See Section 1103(b) of the Bankruptcy Code.

**8.** See and compare *Matter of Global International Airways Corp.,* 76 B.R. 700, 706–707 (Bkrtcy. W.D.Mo.1987).

**9.** "[L]egal services designed to benefit the bankrupt personally may not be compensated out of the estate." *In re Orbit Liquor Store,* 439 F.2d 1351, 1354 (5th Cir.1971).

**10.** See note 9, *supra.* See also *Matter of Jones,* 665 F.2d 60 (5th Cir.1982).

deposit to the applicant law firm. In a letter later written to the court and counsel for the interested parties, counsel for the applicant law firm omitted the last fact[11] and also employed some legerdemain to insist that the answers given by them in the hearing—to the effect that applicant counsel had never received any payment from Azima—were not in error.[12] But the substance of the transactions are clear. The applicant law firm had been paid, or were in the process of being paid,[13] by Mr. Azima at the times in question and owed their primary allegiance to him, not to the bankruptcy estate from which they now have the temerity to seek recompense on the contention that they have rendered services, "in aid of administration of the estate."

It does not seem to this court possible that the applicant counsel could have had a good faith belief that it was the court's intention to set aside the order of confirmation which had been entered by former Judge Pelofsky. This court made it clear in the proceedings for appointment of special counsel that the time within in which the law would permit such action to be taken had long since run out.[14] The same is true of the action which was later brought by special counsel seeking turnover of the assets which Mr. Azima was alleged to have spirited away from the estate. This court repeatedly made it clear that it could not set aside the order of confirmation, whatever the malefactions it may have committed or ratified, although it is certainly within the power and duty of this court to interpret that order. See *Matter of Global International Airways Corp.*, 76 B.R. 700, 706 (Bkrtcy.W.D.Mo. 1987). In view of these facts, it seems overbold now to attempt to attribute this motive to the court and to attempt to predi-

cate a claim that services were rendered, "in aid of administration of the estate" upon it.

But, when the facts and law which support a claim are as nonexistent as they are in respect of applicants' application for fees from an estate which they did their level best to diminish, any form of persiflage will apparently suffice. In the course of the hearing of December 1, 1987, counsel for the applicant law firm raised the contention—previously rejected by the court in approving the appointment of Mr. Sinclair as special counsel—that the appointment was a "clever ploy" of defendants in preference actions which had been brought by the estate to prevent effective prosecution of those actions, a "clever ploy" which counsel characterized as a "highly successful one." It must be mentioned in this regard that the decisions which were made by this court in denying certain of these claims were firmly based in law and fact. It was simply another of the disadvantages suffered by the general creditors of the debtor as a result of the order of confirmation that, while the principals of the debtor were to be permitted all or most of the debtor's property which had any recognizable value, the general creditors were to be satisfied with a chimerical hope of collecting preferential payments which had allegedly been made to some of their number. Many of the potential preference actions were not recoverable because of defenses which should have been recognized at the outset. And it is one thing to take preference payments from legitimate creditors and restore those payments to the creditors *pro rata* so that the paramount bankruptcy goal of equality of treatment is achieved. But it is quite another to collect such preferences when it is a foregone conclusion, as it was in this case, that they were certain

---

**11.** Apparently, the payment from Mr. Azima was classified by the applicant law firm as a "deposit." Thus, their contention appears to be that the sums paid out of the "deposit" to the law firm were not direct payments coming straight from Mr. Azima and that it was therefore truthful to say that the applicant law firm received no payment directly from Mr. Azima.

**12.** See note 11, *supra*.

**13.** See note 11, *supra*.

**14.** Section 1144 of the Bankruptcy Code makes an order of confirmation revocable only within 180 days after its entry and then "if and only if such order was procured by fraud." Throughout this process, the court never gave any indication that it intended to consider setting aside the order of confirmation and several times mentioned that the Section 1144 time limit had run out.

to be consumed by certain expenses of administration which Mr. Azima has been permitted to build up (to an extent that they approximately equal the $1.2 million which he paid to purchase the assets of the estate) and the gargantuan amounts of attorney's fees previously awarded in this case, including some $50,000 to applicant counsel.[15] When one contemplates the mischief which has been perpetrated through the myth that preferences would be recovered to assuage the wounds of the general creditors, a lobbing of casual pejoratives in the court's general direction cannot substitute for a showing which would sustain the application at bar in a reasonable and legal manner.[16]

## II

■ Applicant counsel are therefore not entitled to their attorney's fees from the title 11 estate for the separate and independent reasons (1) that the legal services, if any, which were rendered, were not rendered, "in aid of administration of the estate" and (2) that, as counsel who had been paid or were being paid by Mr. Azima, they had a conflict of interest in purporting to represent the estate.[17] But there is a third, separate and independent reason why the fees sought by applicant counsel cannot be awarded; the detailed statement submitted by the applicants does not describe the services which were rendered in sufficient detail to permit the court, in computing the "lodestar" award, as contemplated by the governing case decisions,[18] to determine the general nature of the legal services performed[19] or the reasonableness of the charge sought to be made for that particu-

15. See note 11, *supra.*

16. As observed above in the text of this memorandum, the attorney's fees previously granted and the expenses of administration figure to consume all the estates's funds, so that nothing in the way of distribution will be paid to general unsecured creditors.

17. "[T]he court may deny allowance of compensation for services and reimbursement of expenses of a professional person employed under section 327 or 1103 of this title if, at anytime during such professional person's employment ..., such professional person is not a disinterested person, or represents or holds an interest adverse to the interest of the estate with respect to the matter on which such professional person is employed." Section 328(c) of the Bankruptcy Code.

18. "A logical beginning in valuing an attorney's services is to fix a reasonable hourly rate for his time ... [and] deciding, in each case, the amount to which attorneys would be entitled on the basis of an hourly rate of compensation applied to the hours worked ... [T]he amount thus found to constitute reasonable compensation should be the lodestar of the court's fee determination ..." *Lindy Bros. Bldrs., Inc., of Phila. v. American R. & S. San. Corp.,* 487 F.2d 161, 167–168 (3rd Cir.1973). But, "[b]efore the value of the attorney's fees can be determined, the district court must ascertain just what were those services. To this end the first inquiry of the court should be into the hours spent by the attorneys—how many hours were spent in what manner by which attorneys ... [W]ithout some fairly definite information as to the hours devoted to various general activities, *e.g.,* pretrial discovery, settlement negotiations, and the

hours spent by various classes of attorneys ... the court cannot know the nature of services for which compensation is sought." *Id.* at 167. "[E]ach type service should be listed with a specific time allotment." *In re Bishop,* 32 B.R. 302, 303 n. 2 (Bkrtcy.D.R.I.1983).

19. As observed in note 18, *supra,* the governing authorities require that the "type" of each service be included in the description and that, only through a description of the "type" of each service can its value be determined. Virtually none of the entries in the applicants' detailed statement is sufficiently particular that the court can with any accuracy divine therefrom the "type" of service performed and whether that service was in fact a compensable legal service as opposed to an uncompensable service. Thus, many different notations of telephone calls and conferences are listed with no hint of the substance of those calls, intramural conferences between firm members are mentioned, but with no description of the general type of service which they purport to represent; general references to research, except in certain isolated instances, fail to include any indication of the legal issues on which that research was conducted; the entries appearing to apply to negotiations are so bereft of detail that the reader cannot begin to descry upon what subject negotiations were carried out, or whether there was any trace of success. The few areas in which it is either disclosed in the detailed statement or inferable from the court's knowledge of the case what the types of services were only reveal uncompensable services—i.e., those sought to be charged for preparing and presenting the fee application itself or those sought to be charged for services rendered, as is pointed out in the text of this memorandum, which were anti-

lar service.[19a] With respect to the value of the slim minority of services which are the subjects of adequate descriptions, their value is more than counterbalanced by the fact that the "results achieved"[20] by the efforts, which were nonexistent. By far the greatest number of entries simply do not disclose the nature of the legal services rendered.[21] Others which are sufficiently described or with respect to which the court may infer the nature of the services from other contents of the files and records in the case are in a decided minority.[22] And, given an evidentiary opportunity, counsel did not enlarge upon the deficient descriptions.

Accordingly, for the foregoing separate and independent reasons, an order will be entered of even date herewith denying the application of Locke, Purnell, Rain and Harrell for an award of attorney's fees.

thetical to the interests of the estate. Moreover, the hearing of December 1, 1987, offered a specific evidentiary opportunity in this regard which was declined.

**19a.** See note 19, *supra.* "[T]he court may find that the reasonable rate of compensation differs for different activities." *Lindy Bros. Bldrs., Inc. of Phila. v. American R. & S. San. Corp.,* 487 F.2d 161, ·167 (3rd Cir.1973). But, unless the court can ascertain the nature of the different activities, accurate assignment of value cannot follow.

**20.** "The tangible benefit conferred on the estate and its creditors is clearly a proper measure of the appropriate compensation. Indeed, it has been suggested that; 'The *sine qua non* of the allowance is the benefit the bankrupt's estate and its creditors have derived from the services rendered.' "

**21.** See note 19, *supra.*

**22.** See note 19, *supra.*