**In re Denzil ROBBINS, Debtor.**

**Douglas S. EVANS, Trustee, Plaintiff,**

v.

**Denzil ROBBINS, Defendant.**

Bankruptcy No. 81–03534–S–2.
Adv. No. 86–0377–S–2.

United States Bankruptcy Court,
W.D. Missouri, S.D.

March 8, 1988.

Douglas S. Evans, Springfield, Mo., trustee.

Mathew Placzek, Christopher Stark, Springfield, Mo., for trustee.

James R. Doran, Jerry Redfern, Springfield, Mo., for debtor/defendant.

MEMORANDUM OPINION

FRANK W. KOGER, Bankruptcy Judge.

"The stories of bankrupts who conceal assets have assumed a form almost as conventional as the plots one finds in the plays of Plautus and Terence. Indeed, if they were told with art and possessed more fertility of imagination, a new anthology might be gathered for American literature from the bankruptcy field. As it is, they contain little more than standardized forms of falsehood so often reiterated as to be neither credible nor interesting". *Union Trust Company v. Abesbaum*, 70 F.2d 628 (2nd Cir.1934). Those are the words of The Honorable Augustus N. Hand, and the following chronicle perhaps should be classified as

the exception that proves the rule. Certainly if that learned jurist had reviewed this case, he might have worded the above quote differently.

## BACKGROUND

Creditors filed an involuntary petition against Denzil Robbins in 1981. Debtor was originally adjudicated in January of 1982 but that adjudication was set aside on the question of proper service. Debtor then answered and was adjudicated in November of 1983. That was appealed but the appeal was dismissed. The Honorable Joel Pelofsky held debtor in contempt on May 8, 1985, for failure to file schedules and statements of affairs and set sanctions of $25.00 per day until same were filed. Several thousand dollars later this Court stopped the running of said sanctions because debtor had obtained new counsel who was honestly attempting to perform and also because it was clear that the sanctions were serving no useful purpose. In any event, debtor finally filed schedules in late 1986 and meanwhile, on August 28, 1986, the Trustee filed this adversary Complaint for Turnover which culminated in a three day trial ending February 12, 1988. Both sides have filed their post trial briefs and this unfortunately but necessarily lengthy opinion follows.

The Trustee's first Complaint sounds in 11 U.S.C. § 541(a)(1), (2) and (6) was against twelve defendants but in reality is only against Denzil Robbins and his present wife, Roberta A. Northcutt Robbins, the majority of the other defendants being either relatives or alter egos of the two principal defendants. The Trustee also seeks the Court to report a recommendation for contempt to the District Court. Thus, this opinion will use the term defendants to denominate only Denzil and Roberta Robbins, unless specifically noted otherwise, and the term debtor to denominate Denzil Robbins only. In no event shall that term apply to First National Bank of Del City or Kaw Valley State Bank, both of whose Motions to Sever were granted by this Court.

It is the Trustee's position that debtor possessed considerable assets on the date of filing and that those assets have been traded, exchanged, converted and/or transmuted into defendants' present assets, all of which were the proceeds of the pre-petition assets. Defendants' position was that debtor had only the extremely limited assets shown by the schedules debtor filed; that debtor was "broke" on the date of filing; that debtor was the proverbial high rolling entrepreneur/trader who could be, and frequently was, "broke" one day and "rich" (at least on paper) the next. The filed schedules reflected total assets of $65,455.00, total unsecured claims of $664,964.44, exempt property of $4,750.00 and substantial uncertainty as to many details that realistically could be attributed to the passage of five years from the filing of the involuntary petition to the filing of the schedules, although the Trustee at least would and does attach to them a far different sobriquet.

The Trustee, with permission of the Court, retained the services of counsel who set out on a discovery process that was not only extensive, expensive and protracted but was marked by a high degree of acrimony and which produced required hearings on Motions for Restraining Orders, Motions for Contempt, Motions for Protective Orders and every other legal stratagem permitted. It might be most illustrative to suggest that not one point of one game of one set of the match was not well contested. Throughout the discovery process it was the Trustee's oft asserted contention that debtor was not producing documents or information as required by the Rules of Civil Procedure, while it was the just as aft asserted contention of the debtor that he did not have or could not locate most records that normal business practices would have indicated should have been available and should have been made available. The foregoing paragraph is not intended as criticism or of any indication of any impropriety upon the part of either party, but rather as explanatory of some aspects of the boundaries that outlined the arena. For example, debtor produced only three of the seventeen financial statements that were introduced in evidence by the

Trustee. The Trustee produced the other fourteen. Debtor produced no cancelled checks or bank statements.

## EVIDENCE AND ANALYSIS

The evidence presented proved that Denzil Robbins indeed was a very mobile trader. He dealt in land, stock, livestock (particularly horses), farm equipment, hotels, motels, ranches, farms, and almost any other commodity that either he or his wife were attracted to or appeared to him to have a potential for either short term cash flow or short term or long term profit. He started living with his present wife when she was fifteen, married her when she was eighteen and at various times has filed financial statements which have listed the same assets in his and her name or solely in his name. Mrs. Robbins' age and status is mentioned only to background debtor's testimony that Mrs. Robbins brought horses (undistinguished as to number, name, or value) tack, including "a fancy parade saddle", and cars (again not clearly nor definitively identified) to the relationship. Mrs. Robbins did not testify. For example, the Trustee proved by the testimony of William G. Schermer, Jr., the former owner, that in October of 1979, Mr. Schermer sold the high point halter quarterhorse in the State of Iowa for the years 1977 and 1978, to debtor for $5,000.00 cash, a $20,000.00 promissory note, a 40 acre farm in Rogersville, Missouri and the right to breed 5 mares per year to said horse, without charge, for as long as debtor owned said horse. Mr. Super Smooth, the official name of this quarter-horse, supposedly later was the reserve champion halter quarterhorse at Denver, Colorado, and would have had a value between $60,000.00 to $100,000.00 depending on his later exploits and the quality of the colts he sired. Although Mr. Super Smooth was still in the possession of defendants, debtor maintained that he (or one of his corporations) had pledged Mr. Super Smooth to a third party in 1979 for some $40,000.00 and that when the note came due neither debtor nor his corporation had the money to pay the note but that Mrs. Robbins, at that time Miss Roberta Northcutt, and by the Court's mathematics then some sixteen years of age, had traded out the note for some horses she owned, plus a "fancy parade saddle", plus possibly some other tack, and maybe a car to the note holding third party for Mr. Super Smooth. It must be added quickly that the note holding third party did not at that time have physical possession of said horse nor title thereto, at least registered with the American Quarterhorse Association. Nevertheless it was debtor's testimony that said horse was never property of the estate because he belonged to Miss Roberta Northcutt at the time of the filing of the involuntary petition.

As previously stated, the Trustee introduced seventeen financial statements that debtor or defendants or one of debtor's corporations either singularly or jointly had issued between January 15, 1978 and December 31, 1986. Attached to this opinion is a highly abbreviated summary compiled by the Court showing only date, ostensible issuer, and the total equity shown by each such financial statement. However, the Trustee had prepared and introduced a very detailed summary which identified each asset shown on each financial statement on a graph some 31 inches by 24 inches which facilitated comparison of same. Remembering that the magic date was November 16, 1981, as established by the filing of the involuntary petition, the Court will highlight the two financial statements closest to that date.

On June 2, 1981, debtor issued a financial statement in the name of Deegene Hotel. From the evidence presented at the time of trial that entity was one of three corporations (Deegene Hotel, Deegene Land and Deegene Management) which were granted corporate status by the State of Missouri but which never issued stock, never filed tax returns, never had stockholder or director meetings and never officially created officers. There was no evidence of any ownership of said corporations, if they can be said to exist, by anyone other than debtor. The June 2, 1981 financial statement showed a total equity of $2,304,865.00. On October 25, 1982, debtor issued a financial statement in the names of Denzil and Ro-

berta Robbins. The Court's mathematics indicates Roberta was then either 18 or 19 years old, had received her high school diploma by virtue of G.E.D., and had only been employed for three months in her life other than in the riding, showing and training of horses owned by her or debtor or one of debtor's corporations, and whose debtor testified to assets have already been described earlier in this opinion. The October 25, 1982 financial statement showed a total equity of $1,642,612.00. To give credence to debtor's contention that he had assets of only $65,455.00 on the crucial day, the Court would be required to find that in six months, debtor had lost some $2,239,-410.00 in equity and then like the anecdotal India Rubber Man had rebounded in some eleven months by regaining $1,577,157.00. While same is not impossible, the Court believes it to be very difficult to accept and does not. Particularly when the Trustee introduced copies of the debtor's federal income tax returns for the years 1980 through 1986 and when the 1981 return showed a loss of $3,352.00 for "Total Income" and the 1982 return showed a loss of $4,099.00 for "Total Income".

Further the June 2, 1981 financial statement listed seventeen assets and the October 25, 1982 financial statement listed seventeen assets. The later financial statement added two items that were not on the earlier financial statement valued at $100,-000.00, and dropped completely two items shown in the earlier financial statement. Those two assets were originally valued at $1,400,000.00. Of the fifteen items shown on both financial statements, ten listed identical values for the same item. One listed "Farm Equipment" at $88,533.00 on the earlier but only $88,530.00 on the later. Four items showed substantial disparity in valuation—two going up in value and two down. For example, the item titled "427 acres—Christian County" was listed at a value of $425,000.00 on the June of 1981 financial statement and at a value of $500,-000.00 on the October of 1982 statement while the item titled "Cash on hand and in banks" declined from $5,291.00 to $3,153.00 on the respective statements.

The Court realizes that the apparent purpose of these two financial statements was to obtain or continue borrowing or trading and that, therefore, the stated values would hardly be regarded as liquidation values, fast sale values or anything other than extremely optimistic forecasts of blue sky and no clouds. The bankruptcy schedules, on the other hand, would be more realistically interpreted while listening to a mournful rendition of "Stormy Weather" or "Rainy Sundays". Albeit, to ask this Court to believe this unexplained but miraculous economic recovery following the unexplained but catastrophic economic loss is ludicrous if not insulting. While the Court chooses not to be insulted, the Court refuses to believe debtor's testimony. Were the Court to do otherwise, it would have to find some explanation as to why the $50,000.00 in International Postal Systems Stock, the $21,000.00 in Passbook Savings, the $336,000.00 in art collections and the other identical items from both financial statements could live, die and resurrect all within sixteen months and twenty-three days.

What happened to debtor's assets? The Court does not know. After listening to the debtor's testimony at both this hearing and other hearings the Court will frankly admit that the debtor's hand is quicker than the Court's eye. Perhaps a relatively simple transaction will shed some light on how the debtor has operated in relation to this bankruptcy proceeding. On September 10, 1986, this Court restrained defendants from transferring Victor Federal stock and the Finley River Ranch as well as other specified assets. This was after a hearing attended by debtor and his counsel. On October 18, 1986, debtor traded Victor Federal stock for Spectrum Cellular stock in direct contravention to the Order of this Court. Later debtor traded some Spectrum Cellular stock for a pecan farm in Mississippi and beachfront house near Galveston, Texas. On September 17, 1986, Denzil Robbins, Roberta Robbins and Denzil Robbins' secretary (who was a notary) met a third party at the airport in Oklahoma City. Then and there Denzil Robbins and Roberta Robbins executed a blank warranty deed

to the Finley River Ranch to that third party in exchange for $100,000.00 and the secretary notarized the deed, all again in direct contravention of this Court's September 10, 1986 Order. The third party was supposed to hold the deed for thirty days and to record it only if the $100,000.00 was not paid back. However, the third party recorded the deed the next day and the entire transaction was exposed.

Another example of defendants' conduct, which is only illustrative of how quickly assets disappear, is shown by the Mercedes automobile. On October 28, 1987, debtor testified in deposition that his wife owned a 1987 Mercedes free and clear. On October 29, 1987, defendants borrowed $40,000.00 from a bank using the Mercedes and a $40,000.00 Certificate of Deposit issued in the name of Ashley Robbins (defendants' 5 or 6 year old daughter) as collateral for the loan. The $40,000.00 loan was used to fund the Certificate of Deposit. These are merely three examples of transactions that the Trustee was able to ferret out and produce proof to show the dexterity and agility of debtor.

Finally, to revert back to the financial statements in juxtaposition with the Federal Income Tax Returns. The financial statement of December 31, 1986, issued by Denzil Robbins, showed a "Total Equity" of $15,240,133.00. The latest tax return introduced was for the calendar year 1986. From the year of bankruptcy (1981) when debtor says his assets were $65,455.00, debtor's tax returns filed either individually (1981, 1982 and 1983) or jointly with Roberta (1984, 1985 and 1986) show the following "total income":

| Year | Income |
|------|--------|
| 1981 | ($3,352.00) |
| 1982 | ($4,099.00) |
| 1983 | ($3,953.00) |
| 1984 | $ 476.00 |
| 1985 | $97,857.00 |
| 1986 | $80,096.00 |

or a total positive income of $167,025.00 for the six years including and following the bankruptcy. The Trustee denigrates the supposition that there is any theory, except use of assets existing at the time of bankruptcy, that will explain how a debtor can go from a 10 to 1 liability to asset ratio to $15,240,311.00 total equity position in six years while only showing $167,025.00 in income, inclusive of capital gains, in those same six years. It would seem that the Trustee has more than "Post Hoc—Propter Hoc" reasoning on his side.

This leads to the real crux of defendants' argument. That argument is that it is the burden of the Trustee to show that each or any of defendants' present assets came from assets debtor had at the time of the bankruptcy before defendants can be compelled to disgorge same. To a point defendants are correct in their assertions. The Trustee has a very substantial burden and it is his burden to prove every essential element of his complaint. However, there comes a point at which the Trustee has made at least a sufficient showing that requires if not refutation, at least some rational explanation. The debtor has not only not offered same, the debtor has failed to produce even minimal records, and has certainly been evasive if not totally dishonest in the discovery process. The Court has heretofore recounted debtor's version of Mr. Super Smooth. There is another example proved by the Trustee. There is no dispute that debtor or one of the three Deegene corporations owned the Finley River Ranch prior to the bankruptcy. It was listed as 427 acres—Christian County on the June 2, 1981 financial statement. At that time it had a value of $425,000.00 and a mortgage of $213,849.00.—In 1985 defendants added a new mortgage of $241,297.53. It was debtor's testimony that said sum was used to build improvements on the ranch. True, the ranch's alleged value has increased from $425,000.00 in 1981 to $650,594.00 as of the date of the last financial statement. However, the mortgage was given in 1985 and the ranch was valued at the same $650,594.00 as early as May 10, 1983. Even more damaging to debtor's testimony was the bank's loan file which contained a document describing the purpose of the loan as being to buy a motel and refurbish a motel. On the ubiquitous financial statements, 1985 reveals a new horse barn for $86,409.00 and 500 shares in Ashley Hotel

Co. (remember defendants' 5 to 6 year old daughter whose name is Ashley) and 500 shares in Key Investment Company which apparently was a holding company for various properties. Such factors certainly lend credence to the Trustee's theories.

■ Nor must the Trustee prove that the same identical cash or property now possessed by the debtor is the same identical cash or property possessed by the debtor at the date of bankruptcy. See *South Falls Corporation v. Rochelle,* 329 F.2d 611 (5th Cir.1964) wherein that question was decided against debtor's contentions. Finally the matter boils down to the equivalent of the ancient doctrine of confusion, 15A C.J.S. § 1 (1987). To paraphrase, where someone deliberately commingles property of the Trustee with other property so that the Trustee cannot identify and trace his property, the Trustee is entitled to the entire commingled mass. Debtor had assets, valued at least by him, of between $2,304,865.00 (June 10, 1981) and $1,642,-612.00 (October 25, 1982). From that date, defendants have had income of only $167,-025.00 through calendar year 1986. Several of the assets have been traced as outlined herein. But the Trustee, without that participation the law requires of parties such as the production of documents, answering interrogatories truthfully and completely, and giving of truthful testimony by deposition or in court, will never be able to trace definitively what happened to the assets that the debtor possessed on November 16, 1981.

## CONCLUSION

The Court is going to rule this case in favor of the Trustee, both as to the Motion To Compel Turnover and as to the Motion To Report the Matter to the District Court for possible contempt proceedings. The Court directs that counsel for the Trustee prepare proposed Findings of Fact and Conclusions of Law which this Court will review before issuing its final ruling. The Court also suggests that counsel for the Trustee and counsel for the debtor meet with the Court as to the parameters of how much or what character of property the Court should order turned over to the Trustee. If the debtor owed only some $664,964.44 on November 16, 1981, but has transformed the assets he then possessed into $15,240,311.00, he must be given credit for the $167,025.00 he has earned since the bankruptcy and, of course, should not be required to disgorge more than will pay creditors 100 cents on the dollar, plus interest, plus administrative costs and attorney fees expended by the Trustee. For that reason if an agreement can be reached as to what should be turned over to the Trustee it may make the Trustee's position less difficult and also allow the debtor to continue his entrepreneur/trader existence without the extreme measure of this Court ordering everything turned over, allowing the Trustee to liquidate, and then turning back to debtor any surplus. Defendants and both of them are reminded that there are Restraining Orders presently in effect and that until this matter is resolved they are not to transfer, pledge, trade, hypothecate, or otherwise transfer, transmute, or change in any fashion any assets which they possess without permission of this Court.

The issues of contempt against both defendants will be referred to the District Court of the Western District of Missouri, Southern Division, after the filing of Findings of Fact and Conclusions of Law, and the ruling of the Court will not be final until then.

### SUMMARY

| DATE | ISSUER | EXHIBIT NO. | TOTAL EQUITY |
| --- | --- | --- | --- |
| January 15, 1978 | Denzil Robbins | 25 | $1,270,035.00 |
| March 20, 1978 | Denzil Robbins | 26 | $1,418,135.00 |
| November 28, 1978 | Denzil–Gard | 27 | $3,090,703.00 |
| July 28, 1979 | Denzil–Gard | 28 | $3,684,693.00 |
| January 11, 1980 | Denzil–Gard | 95 | $4,335,562.00 |
| January 25, 1980 | Denzil–Gard | 29 | $4,476,130.00 |
| June 2, 1981 | Deegene Hotel | 30 | $2,304,865.00 |
| October 25, 1982 | Denzil–Roberta | 80 | $1,642,612.00 |

### SUMMARY

| DATE | ISSUER | EXHIBIT NO. | TOTAL EQUITY |
|---|---|---|---|
| May 10, 1983 | Denzil–Roberta | 31 | $3,578,190.00 |
| December 27, 1983 | Denzil–Roberta | 32 | $5,858,731.00 |
| July 17, 1984 | Denzil Robbins | 33 | $5,250,127.00 |
| June 18, 1985 | Denzil Robbins | 34 | $7,594,546.00 |
| September 15, 1985 | Denzil Robbins | 35 | $10,419,231.00 |
| December 31, 1985 | Denzil Robbins | 61 | $10,313,833.00 |
| April 30, 1986 | Denzil Robbins | 36 | $12,562,503.00 |
| August 31, 1986 | Denzil Robbins | 37 | $14,645,682.00 |
| December 31, 1986 | Denzil Robbins | 38 | $15,240,133.00 |